1

```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
 2
        - - - - - - - - - - - - - X
 3
      UNITED STATES OF AMERICA,      : 15-CR-637(KAM)
 4                                   :
                                     :
 5                                   :
           -against-                 : United States Courthouse
 6                                   : Brooklyn, New York
                                     :
 7                                   :
                                     : Friday, March 9, 2018
 8      MARTIN SHKRELI,              : 11:00 a.m.
                                     :
 9            Defendant.             :
                                     :
10      - - - - - - - - - - - - - X
11                    TRANSCRIPT OF SENTENCING
              BEFORE THE HONORABLE KIYO A. MATSUMOTO
12              UNITED STATES DISTRICT COURT JUDGE
13               A P P E A R A N C E S:
14    For the Government: RICHARD P. DONOGHUE, ESQ.
                          Acting United States Attorney
15                        Eastern District of New York
                              271 Cadman Plaza East
16                            Brooklyn, New York 11201
                          BY:  JACQUELYN KASULIS, AUSA
17                             ALIXANDRA E. SMITH, AUSA
                               KARTHIK SRINIVASAN, AUSA
18                             CLAIRE KEDESHIAN, AUSA
                               LAURA MANTELL, AUSA
19
      For the Defendant:  BRAFMAN & ASSOCIATES, P.C.
20                            767 Third Avenue
                              New York, New York 10017
21                        BY:  BENJAMIN BRAFMAN, ESQ.
                               MARC AGNIFILO, ESQ.
22                             ANDREA ZELLAN, ESQ.
                               JACOB KAPLAN, ESQ.
23                             TENY GERAGOS, ESQ.
24    Court Reporter:          Denise Parisi, RPR
                               Official Court Reporter
25                             E-mail: DeniseParisi72@gmail.com
```

Proceedings                                               2

1    Proceedings recorded by computerized stenography.  Transcript
     produced by Computer-aided Transcription.
2

3                    *     *     *     *     *

4         THE COURTROOM DEPUTY:  This is a criminal cause for

5    sentencing.  Docket No. 15-CR-637.  USA versus Shkreli, as to

6    Martin Shkreli.

7         Counsel, please state your name for the record,

8    starting with the Government.

9         MS. KASULIS:  Thank you.

10        Good morning, Your Honor.  Jacquelyn Kasulis,

11   Alixandra Smith, Karthik Srinivasan, Laura Mantell, and Claire

12   Kedeshian from the US Attorney's Office.  With the FBI, we

13   have Special Agents Mike Braconi, Sean Sweeney, and from

14   probation, we have Probation Officer Michelle Murphy.

15        THE COURT:  Good morning.

16        MR. BRAFMAN:  Good morning, Your Honor.  Benjamin

17   Brafman, Marc Agnifilo, Andrea Zellan, Jacob Kaplan, and Teny

18   Geragos for Mr. Shkreli, who is present in the courtroom.

19        THE COURT:  Good morning.

20        Let me just ask Mr. Shkreli to please raise his

21   right hand and take an oath to tell the truth.

22        Sir, do you swear or affirm that the statements you

23   are about to give this Court will be the truth, the whole

24   truth, and nothing but the truth.

25        THE DEFENDANT:  I do.

Proceedings                                                          3

1           THE COURT:  Please have a seat, sir.

2           MR. BRAFMAN:  Your Honor --

3           THE COURT:  Yes, sir.

4           MR. BRAFMAN:  -- do you have any objection if I

5    address the Court from here?

6           THE COURT:  Not at all, no.  Wherever you are

7    comfortable.

8           MR. BRAFMAN:  Thank you.

9           THE COURT:  I did want to note that we received from

10   probation this morning a letter from an individual victim who

11   asks for restitution.  We will provide copies of that request,

12   and if the parties would like, we can leave the judgment open

13   for a period of time so that Mr. Brafman can respond and the

14   Government as well to the request for restitution.

15          MR. BRAFMAN:  Thank you, Your Honor.

16          We did receive a copy and we spoke briefly with the

17   probation officer who informed us of the letter and also

18   indicated that it is still probation's position that

19   restitution was not appropriate.

20          THE COURT:  All right.

21          THE PROBATION OFFICER:  We did not receive a copy.

22   We don't have a copy.

23          MR. BRAFMAN:  I just got it from the clerk.

24          THE PROBATION OFFICER:  Oh.

25          THE COURT:  All right.  Well, I think that pursuant

Proceedings                                                    4

1   to the usual procedures, letters were sent out to victims to

2   see if anyone wanted to put in a request for restitution, and

3   I do think it is a piece of this that we do have to address,

4   because restitution, as you know, is mandatory, and I do think

5   that the parties should have an opportunity to make

6   submissions if they chose to be heard.

7            MR. BRAFMAN:  Thank you.  We would be requesting

8   that the judgment of conviction be kept open for a couple of

9   days, in any event, regardless of the sentence so that we can

10  address the issue of designation once we know exactly what the

11  sentence is.  So to the extent that we can have until Tuesday

12  to address restitution and the issue of a judicial

13  recommendation, that would be our request.

14           THE COURT:  Does the Government object?

15           MS. KASULIS:  No, Your Honor.

16           THE COURT:  All right.

17           MR. BRAFMAN:  Thank you, Judge.

18           THE COURT:  Thank you.

19           Mr. Shkreli, as you can see, we have a court

20  reporter here who is making a record of today's proceeding,

21  and the transcript of this proceeding will be made part of the

22  official court record.  I understand that you will be

23  appealing your sentence, and that is appropriate and that is

24  your right, and the transcript will be available to you for

25  that purpose.

Proceedings                                          5

1          THE DEFENDANT:  Thank you, Your Honor.

2          THE COURT:  I would like to confirm that the

3    Government has provided notice to any victims who may be

4    entitled to notice of these proceedings and who may be subject

5    to a restitution order.

6          MS. KASULIS:  Yes, Your Honor.  We have provided

7    such notice.

8          THE COURT:  All right.  Thank you.

9          For the record, the one letter that we do have from

10   the victim is requesting restitution, order in the amount of

11   $778,947.63, and I will be happy to receive further

12   submissions.

13         I have previously issued orders, as you know,

14   regarding the loss amount and forfeiture in this case and have

15   considered the material submitted in connection with those

16   submissions and motions in preparing for today's sentencing.

17         I've also reviewed the Probation Department's

18   presentence report dated December 12, 2017.  Their sentencing

19   recommendation dated January 16th, 2018, and the presentence

20   report addenda dated February 21, 2018, March 9th, 2018, and

21   March 6th, 2018.

22         I've also reviewed Mr. Shkreli's objections to the

23   presentence report dated January 3rd, 2018, his sentencing

24   memorandum and attachments dated February 27th, 2018, and

25   letters dated March 7th and March 8th, 2018, from Mr. Brafman.

Proceedings                                              6

1          I have also reviewed the 55 letters of support that
2    were submitted by defense counsel; and, in addition, I've
3    reviewed the Government's response to Mr. Shkreli's objections
4    to the PSR dated January 25th, 2018, the Government's
5    sentencing submissions dated March 6th, 2018, and the
6    Government's March 7th, 2018, letter.
7          In addition, I have reviewed approximately 15
8    sentencing letters that were submitted directly to the Court
9    by members of the public and representatives of various
10   organizations.  All of those submissions have been shared with
11   both parties.
12         Have I overlooked any submissions.
13         MS. KASULIS:  No, Your Honor.
14         MR. BRAFMAN:  No, Your Honor.
15         THE COURT:  I would like to confirm, Mr. Shkreli,
16   that you are a United States citizen so we need not address
17   probation consequences.
18         THE DEFENDANT:  I am a citizen.
19         THE COURT:  Thank you, sir.
20         Mr. Shkreli, are you satisfied with your attorney
21   and his team, Mr. Benjamin Brafman and the lawyers who are
22   representing you here today.
23         THE DEFENDANT:  Yes.
24         THE COURT:  Are there any unresolved conflicts,
25   contentions, motions or other issues that I must resolve?

Proceedings                                    7

1            MR. BRAFMAN:  No, Your Honor.

2            THE COURT:  Mr. Shkreli does appear to be fully

3     alert and to be following these proceedings closely.

4            Would you agree with that observation, Mr. Brafman.

5            MR. BRAFMAN:  Yes, Your Honor.

6            THE COURT:  Do you know of any reason why we should

7     not proceed with Mr. Shkreli's sentencing today.

8            MR. BRAFMAN:  No, Your Honor.

9            THE COURT:  Mr. Shkreli, have you had the

10    opportunity to read the presentence report and other filings

11    made on your behalf by your attorney and by probation and the

12    Government?

13           THE DEFENDANT:  Yes.

14           THE COURT:  Did you have any difficulty

15    understanding those submissions?

16           THE DEFENDANT:  No.

17           THE COURT:  Have you discussed those submissions

18    with your attorney, sir?

19           THE DEFENDANT:  Yes.

20           THE COURT:  Are you now ready to be sentenced?

21           THE DEFENDANT:  Yes.

22           THE COURT:  Now, on February 23rd, 2018, I held an

23    oral argument regarding Mr. Shkreli's Rule 29 motion, the loss

24    amount, and forfeiture application in this case.

25           In addition, Mr. Shkreli, you do have the right to

Proceedings                                                8

1    what's called a Fatico fact-finding hearing, which is a

2    hearing during which parties may present evidence relevant to

3    sentencing.

4              Do you wish to have a Fatico hearing, sir?

5              THE DEFENDANT:  No.

6              THE COURT:  You do have the right to make a

7    statement here in court, if you wish to be heard.  I will

8    assure you that I have read your letter, but if you would like

9    to be heard further, I'm happy to hear from you.

10             MR. BRAFMAN:  Your Honor, would the Court allow

11   Mr. Shkreli to address Your Honor personally after the parties

12   have completed their arguments and before you impose sentence?

13             THE COURT:  Yes.  I usually hear from the defendant

14   at this point, but does he want to wait?

15             MR. BRAFMAN:  He would prefer and as would I.

16             THE COURT:  All right.  Well, I would just ask then

17   that you let me know when you want to be heard.

18             MR. BRAFMAN:  I would ask that once the defendant

19   and the Government have completed their arguments and before

20   Your Honor is prepared to decide the sentence or issue your

21   ruling, that you ask Mr. Shkreli to address the Court, and we

22   will remind you if you have not.

23             THE COURT:  All right.  Because, as you know, there

24   are a number of matters that I must discuss:  your objections

25   to the presentence report, the Government's responses, your

Proceedings                                              9

1  sentencing requests, the Government's responses to that, and

2  other matters.  So I'm just not sure where in this process you

3  would like to be heard.

4       I will also be discussing my own individual

5  calculation of the sentencing guidelines, as well as the

6  discretion of the 3553(a) factors under the criminal code.

7       MR. BRAFMAN:  Well, it was my hope that, Your Honor,

8  as I briefly discussed with the Government, I think defendant

9  has adequately preserved its position with respect to our

10  objections to the PSR.  I think we have adequately stated our

11  position with respect to loss and forfeiture.  Your Honor has

12  ruled and we, for the purposes of proceeding, obviously accept

13  those rulings.  I think at some point, after the parties have

14  addressed Your Honor on where the sentence should be in their

15  view and respectfully discuss the submissions in part and the

16  3553 factors, I'm assuming the Court will then read or speak

17  on where you see the guidelines and what you determine to be

18  issues that are appropriate for consideration, and then

19  ultimately pronounce sentence, and I would ask that

20  Mr. Shkreli be permitted to address the Court after the

21  parties have spoken and before Your Honor starts.

22       THE COURT:  All right.  Well, at this point, I

23  generally hear from the defendant, his lawyer, and the

24  Government, so if you would like to be heard, Mr. Brafman, I'm

25  happy to hear from you.

```
                        Proceedings                  10
```

1           MR. BRAFMAN:  Thank you.

2           THE COURT:  I appreciate your sentencing

3    submissions, I thought they were thorough and fully provided a

4    more fulsome picture of Mr. Shkreli, his background, and who

5    he is beyond the charges in this case.

6           MR. BRAFMAN:  Thank you, Judge.  We certainly tried.

7    Judge --

8           MS. KASULIS:  Mr. Brafman, I'm sorry, before we

9    proceed, because of the extent of the redactions --

10           MR. BRAFMAN:  Right, I was going to say that.

11           MS. KASULIS:  Okay.  I'm sorry.

12           MR. BRAFMAN:  Your Honor, we briefly discussed among

13   each other, and I'm happy to just tell you our understanding,

14   obviously, subject to Your Honor's approval, it's almost

15   impossible, I think, for either side to speak knowingly and

16   fully on the issues before Your Honor and address them

17   publicly without touching on what we had filed at least

18   initially as redacted materials, and I think that we both

19   agree that in order to flesh these out, we may have to discuss

20   some of what we have initially asked to be redacted.

21           I think we both agree that after the argument and,

22   depending on Your Honor's view, should you feel that in the

23   interest of fairness, the public then needs to know what we're

24   talking about, we would remove our objections to the

25   redactions.  I don't intend to mention names of people who

Proceedings                                    11

1   would like to keep their names private.  There are some people

2   who, I think, we can mention.  But in terms of the evaluation

3   that we submitted and -- I understand that was our request to

4   keep it under seal, but both sides have spoken about it in

5   their sentencing submissions and it's almost impossible to

6   dance around what is redacted, what isn't redacted when having

7   an open discussion.

8           THE COURT:  Well, I do think that the submissions by

9   the parties generally are subject to public view.  The concern

10  I have is that to the extent those submissions discuss private

11  information or medical information about individuals who are

12  not before the Court, that the privacy rights of those

13  individuals should be protected.

14          I believe you may be referring to the psychological

15  report that was submitted by Dr. Salzman.  To the extent you

16  wish the Court -- and I have reviewed it and it will factor

17  into my sentencing -- but to the extent you wish me to

18  consider it and to explain how that report is factored into my

19  sentencing consideration, I do believe that it should be

20  spoken about in open court.  I am certainly not going to talk

21  about personal issues that may touch upon individuals who have

22  had a role in Mr. Shkreli's life, whose personal information

23  may be discussed in that report.

24          MR. BRAFMAN:  Neither will I, Your Honor, and I

25  think we can redact -- still redact those issues, those

Proceedings                    12

1   matters very quickly without keeping the entire report under

2   seal.  I think that's relatively easy, and we can do that

3   after the sentencing; and I don't intend, in open court, to

4   mention those issues or refer to them.  I agree with you, Your

5   Honor.

6           THE COURT:  Well, I do appreciate the fact that the

7   parties have worked well together in coming to an agreement as

8   to how best to deal with some of the sensitive information in

9   this case, and I will be happy to hear from the parties

10  regarding their proposed redactions on this report and any

11  other issues.

12          As you know, to the extent some of these unsolicited

13  letters from the public have come to my attention and to the

14  extent they may have discussed individuals' medical

15  conditions, I've tried to protect the privacy of those

16  individuals, unless they are talking about their own

17  conditions and wish them to be disclosed.

18          MR. BRAFMAN:  I understand, Your Honor.

19          THE COURT:  All right.

20          MR. BRAFMAN:  Your Honor, thank you, and I'm --

21  I'm -- I'm going to try, obviously, not to repeat the large

22  volume of materials that we submitted.  This is the first time

23  I have appeared before this particular court in connection

24  with a sentencing, and it's a privilege, as always, to appear

25  before Your Honor and before I begin, I just wanted to thank

1  you for the courtesies that you extended to counsel in a

2  professional manner during a difficult trial and throughout

3  all of the proceedings that followed, and on a personal,

4  professional level, I think I speak for the whole team.  It's

5  always easier when everyone keeps their discussions on a

6  professional level, so I appreciate that, Judge.

7          THE COURT:  I appreciate counsels' efforts to

8  maintain appropriate courtroom demeanor and to make sure that

9  the trial progressed in an efficient way.

10          MR. BRAFMAN:  And I also want to say at the outset

11  that although I intend in my discussion, as I have in our

12  written submission, I intend to challenge some of the

13  statements made by the Government in their sentencing memo.

14  It is not my intent to be personal and critical of any person

15  in the Government's camp.  I have a great respect for the way

16  they have conducted themselves, and I think, on balance, we

17  have pretty much conversed, despite our adversarial nature, in

18  a professional manner.

19          I am, obviously, in disagreement with a number of

20  things that they said, but I want Your Honor to understand,

21  and they too, that my argument is with the Government's

22  position, it's not with any of the Government lawyers, nor do

23  I suggest that by disagreeing with their position it suggests

24  any level of incompetence or personal attack.  It's obviously

25  difficult in an adversarial position to maintain that balance,

Proceedings                                          14

1   but I've really made an effort in this case to do that, and I

2   want to continue to do that today.

3            I also want to indicate to the Court that one of the

4   difficulties in appearing before a court, even a court where

5   you've spent a great deal of time now, but the first time in a

6   sentence, is what to expect.  And I, like other good lawyers,

7   talk to other people who have had many sentences before Your

8   Honor; and, uniformly, they all tell me that you essentially

9   come out on the bench and you know the materials as well as

10  the parties and you have spent a great deal of time in

11  reviewing them, and I appreciate that, and as a result, I

12  don't intend to read the large volume of materials that we put

13  together.

14           I think I've also learned over the years that my

15  role as an advocate doesn't end with a verdict and that

16  sentencing advocacy is something I take very seriously and

17  it's something I have spoken on professionally because I'm not

18  certain all of the people in the criminal defense bar

19  understand how important the role of a defense lawyer is, even

20  if a bad verdict arises because there's a lot of things that

21  you can do professionally to hopefully inform the Court more

22  fully about some of the issues, so we've tried to do that.

23           And I also know from many of the colleagues, and

24  your colleagues in this building, who I have asked this direct

25  question, once on a panel and once privately, If I'm before a

Proceedings                                15

1   Court and I know that the judge has read everything, should I

2   bother to address these issues in an open court on my feet in

3   the presence of the defendant on the record and in the

4   presence here, obviously, of the whole world, and all of them

5   have said yes, that's your job, A; and B, you never know when

6   a Judge may, in fact, be moved one way or another by something

7   one of the advocates says and it's not your job to conclude

8   that a Judge has made up his or her mind before you speak, so

9   you do your job and then let the Court decide what to accept

10  or reject from your arguments.

11          And there's another issue, Judge.  The issue in this

12  case is that I have the ability to impact on what the written

13  record here will have for the rest of eternity, and today,

14  with the press of a button, anyone who wants to see what's

15  said about Martin Shkreli can just look at it and find it and

16  either buy it or download it, and that as a result, I think I

17  owe it to him and to his family that the record not only

18  contain bad things, because we're obviously at a sentencing,

19  and in a sentencing, the Government usually stands up and says

20  the defendant did the following things and therefore he or she

21  should get the following punishment.  And I think the record

22  should reflect, and I think Mr. Shkreli, quite frankly,

23  deserves that some of the quite extraordinary things people

24  have said about him be part of this record and that some of

25  the extraordinary things that he has done be part of this

Proceedings                                    16

1    record as well.  So I ask Your Honor to indulge me just a

2    little bit more.  I know you have been quite patient

3    throughout the trial that I'm not speaking just for the sake

4    of speaking.  I am -- I'm trying very, very hard not to fight

5    with you today.  Quite frankly, I'm -- I've got my begging

6    voice on because I'm trying very hard to suggest with great

7    respect for everyone in the well of the courtroom that the

8    Government's recommendation is too severe, that to suggest

9    that someone like Mr. Shkreli, for the crime he stands

10   convicted of, should face 15 years in prison is just not

11   appropriate.  I don't think it's illegal, and I'm not

12   suggesting they do anything wrong by suggesting it, I just

13   think it's just not appropriate, that it's not warranted and

14   that he should not be sentenced solely for being Martin

15   Shkreli.  I understand how frustrating that may be to you,

16   Your Honor, quite frankly, to me too.  There are times -- I

17   have been with him now for two years and I've gotten to know

18   him quite well and, quite frankly, he's -- I'm old enough to

19   be his father, I'm not, but I do have the benefit of a lot of

20   years on him, and there are times when I want to hug him and

21   hold him and comfort him, there are times when I want to punch

22   him in the face because he's made my job, to some extent, more

23   difficult by some of the things he has said, and I think when

24   you read the evaluation and you understand, you know, who

25   Martin Shkreli is and how he is wired and what makes Martin

Proceedings                                                    17

1   Shkreli be Martin Shkreli, I think it suggests that sometimes

2   what he says that appears to be inappropriate is not something

3   he is saying because he's a bad person.  It's something he is

4   saying because at times he doesn't fully appreciate how other

5   people will react to it.  That's something Dr. Salsberg has

6   stressed, that someone like Martin Shkreli, who is made like

7   Martin Shkreli, who may be brilliant in certain matters may

8   nevertheless lack certain people skills, may have some degree

9   of social awkwardness; and sometimes when you are as smart as

10  I think everyone now, I would hope, agrees he is sometimes

11  what comes out of your mouth before you have a chance to

12  really think it through is sort of like the kids today who hit

13  send before they really understand what they've texted, and

14  sometimes what they send really hurts them for years to come

15  and yet, you know, sometimes you are dealing with a

16  fundamentally good kid who has done something, you know,

17  stupid or aggravating.  And some of the letters discuss that

18  quite candidly and quite fully, and I want to discuss it as

19  well, because I think what the Government has done in its

20  submission is painted a dark picture of Martin Shkreli in an

21  attempt to suggest to the Court that he is an evil man who

22  deserves to be punished with a draconian sentence, which is

23  what I think 15 years is, and although they have, to their

24  credit -- even the Government concluded that a guideline

25  sentence is not appropriate, and in this case the guidelines

Proceedings                                    18

1   would be just out of sight, it would end his life, they have

2   come to you with a number that I say, and I say this doesn't

3   sound respectful, I think it's a made-up number.  Why

4   15 years?  They don't give you any basis for suggesting that

5   the 180 months is the appropriate sentence.  Why not six

6   years?  Why not 36 months?  Why not 120 months?  It's a

7   made-up number.  It's a number that they feel is adequate and

8   punitive and is very, very full of punishment and very, very

9   devoid of compassion or rehabilitation.

10          So I think we start with the premise that you have

11  wide discretion, and I think you have extraordinary discretion

12  and that's what is both comforting and difficult in this role

13  today, because I don't know where Your Honor is in between

14  time served and 15 years or a guideline sentence.  So my hope

15  is that you are somewhere below the Government's application

16  and somewhere close to our application, and I understand that

17  walking out of here with our request, it be, you know, a

18  miracle under the circumstances, but I'm hoping that Your

19  Honor recognizes from the materials that we have submitted

20  that this is an interesting man with, I think, great

21  potential, and that, in many ways, in my own view, and I say

22  this despite the fact that I understand the technical

23  decisions that the law requires.

24          I understand that Your Honor's ruling's on the issue

25  of loss, I understand how the guidelines are calculated, and

Proceedings                                                19

1    I'm not discussing them or arguing them or asking you to

2    change your mind, but I am saying, and I try and say this with

3    some degree of modesty, I've never seen a securities fraud

4    case like this, and I don't think the Government has, and

5    that's why when they submitted their letter to Your Honor or

6    their memo to Your Honor in which they cite cases that they

7    believe suggest sentencing parity, it's a throwaway at the end

8    of a good sentencing memo where they're just saying, By the

9    way, we know the defendant has given you a list of cases where

10   modest sentences have been imposed in many districts in

11   securities fraud cases, but here's five cases where the courts

12   have imposed very, very high sentences in securities fraud

13   cases; and when I looked at it initially, I was sort of

14   stunned, because when you drill down into the facts of those

15   cases and you look at the decision in Lang, for example, there

16   were more than 300 victims, they were all vulnerable victims,

17   they were Hurricane Katrina victims who lost their homes and

18   the opportunity to rebuild and there was a substantial fraud

19   and the defendant was found to have bought the -- with the use

20   of the funds to buy expensive motorcycles, expensive homes,

21   and use those funds to live a lavish lifestyle.  That's not a

22   parity case for the Court to consider, Your Honor.

23            In the case of Aaronson, it's a case where the

24   defendant was already serving 40 months for a previous

25   securities fraud case, and it was a category three defendant.

```
                        Proceedings                    20

 1    This defendant, as we all agree, is a first-time offender,

 2    he's in Criminal History Category I and he had no prior

 3    conviction, and the fact that he is remanded is not as a

 4    result of a crime.  He's remanded because Your Honor had the

 5    ability to do it because he was on bail in this case, but the

 6    facts that caused him to be remanded would not, by themselves,

 7    in my opinion, give rise to a separate criminal case because

 8    of, I think, the First Amendment cases that suggest, however

 9    offensive it might be what you said, so I'm not quarreling

10    with Your Honor's decision to remand Mr. Shkreli, but it's not

11    a prior conviction.  He comes before you as a first-time

12    offender, despite the fact that he was on bail and lost his

13    right to continue on bail.

14         And I also suggest that the Galanis case is a

15    defendant who is a Criminal History Category III, and the

16    Jaramillo case was a person who targeted -- specifically

17    targeted retirees, widows, and off -- and -- and individuals

18    who had retired where English was a second language and took

19    more than half of the investors' money for a lavish lifestyle.

20         The point I am making, Judge, is that when you are,

21    in effect, dealing with the facts in this case, and I say this

22    mindful of the decisions Your Honor made with loss, but I

23    think all of us would agree that there's something unique

24    about this case because he was acquitted of five counts, and I

25    think that's not a flippant matter for the Government to, sort
```

1   of, ignore and then suggest, Well, you know, those crimes were

2   proved by preponderance of the evidence, for example, so Your

3   Honor can consider them.

4          The fact is that when you look and you drill down at

5   the verdict in this case, the crimes that he was acquitted of

6   would have required the jury to find beyond a reasonable doubt

7   that Mr. Shkreli intended to deprive these people of their

8   money and the jury said, No, we don't see that beyond a

9   reasonable doubt.

10         And with respect to the Retrophin count, they would

11  have been required to find beyond a reasonable doubt that he

12  intended to defraud his company, his baby, a baby that's now

13  worth a billion dollars.

14         So at the end of the day, I understand where you

15  come out on the loss, and I understand the technical

16  definitions and I also understand the Government's, sort of,

17  Hail Mary by saying, Well, look, Judge, he did benefit because

18  he helped -- he was able to build Retrophin, he was able to

19  pay back Merrill Lynch.  But at the end of the day, even if

20  that's true, we don't see the defendant taking money and

21  traveling lavishly; we don't see the defendant taking money

22  and buying exotic materials.  When Retrophin becomes public,

23  yes, he does make some stupid purchases, but it's not during

24  the MSMB, MSMB Healthcare period when he's taking investors'

25  money and just sticking it into his own pocket.  And at the

Proceedings                                          22

1   end of the day, to the extent that he is -- he has believed to

2   have to built Retrophin, and I'm not going to argue the facts

3   in this case, but the Government can't just take the entire

4   billion-dollar company and say because some of that was

5   essentially the result of being able to use MSMB investor

6   money, you should discount the entire success that was built,

7   you can't -- you really can't do that, Your Honor.

8              And the interesting part about this case as well is

9   I've never been in a case, and I don't know of any other

10  securities fraud case where each of the people who came in to

11  testify as victims, who the Government has a right under the

12  law to characterize as victims for the purposes of the victim

13  enhancement, each of them nevertheless made two, three, four,

14  five, some of them ten times their money.  I've never seen

15  that in a securities fraud case.  In a Ponzi scheme, which the

16  Government suggests there is, there is no happy ending.  At

17  the end of a Ponzi scheme, there's zero money, everybody loses

18  except the people who are paid back as a result of other

19  people's investments.

20             So at the end of the day, Judge, there is something

21  unique about this case.  And I also think, Your Honor, that

22  the jurors' verdict in this matter has to matter, and I think,

23  Your Honor, having sat now through two trials -- and I don't

24  want to say anything that will in any way impact on

25  Mr. Greebel's sentence at a later time before Your Honor,

1   that's not my purpose, but when you look at the verdict in

2   which he was convicted on Count Seven of the Retrophin fraud

3   and you look at the verdict in Mr. Shkreli's case where he was

4   found not guilty of that fraud, there is a method to the

5   madness with respect to what the jurors did, and the method to

6   the madness was, I believe Your Honor charged, in our case,

7   that Mr. Shkreli had a reliance on counsel defense, and that

8   if the jury found that he had a reasonable basis to rely on

9   Mr. Greebel's advice, that that would be a complete defense.

10          So the rationale for the verdict in our trial --

11  Your Honor helped us pick a remarkable jury.  I don't think

12  anybody in this room, certainly not me, has ever gone through

13  a voir dire where the basic, inherent, volatile prejudice of

14  some of the jurors was spoken openly and candidly to the

15  Court, and I think Your Honor did a very good job of passing

16  on those people, and, ultimately, with your help, I think we

17  found a reasonable group of people who were determined not to

18  sentence Martin -- not to convict Martin Shkreli because he's

19  Martin Shkreli but to determine whether the Government had met

20  its burden with respect to each and every count and to get

21  beyond the drama of the trial wherein media gauntlets were

22  faced every day, and get beyond the Daraprim issue, which had

23  nothing to do with the crimes, and they were able to do that.

24          And I'm asking you, and I say this with great

25  respect, that Your Honor do that as well when you determine a

Proceedings                                    24

1   sentence; that you not sentence Martin Shkreli because he's

2   Martin Shkreli with all the baggage that he brings to the

3   table that really has nothing to do with the crime of

4   conviction.  I know it's hard to do that and I --

5               THE COURT:  Well, I will assure you that his online

6   media presence, of which I have been unaware, unless and until

7   someone brings it to my attention, and the comments that he's

8   made outside the courtroom were not evident when he was in

9   this courtroom throughout the whole trial.  He behaved

10  appropriately, respectfully, and presented as the intelligent

11  young man that he is.

12              So I understand very well that the Daraprim pricing

13  is not an issue before me --

14              MR. BRAFMAN:  Then I'm going to move on.

15              THE COURT:  -- and also that whatever adverse media

16  attention he's brought upon himself through his online

17  presence or comments is also not before me, except to the

18  extent that we had to deal with a bail revocation.

19              MR. BRAFMAN:  I understand you and I'm happy to hear

20  that and I won't belabor those issues, so thank you, Judge.

21  Forgive me for having -- obviously reading the Government's

22  memo, I have no idea what Your Honor --

23              THE COURT:  Well --

24              MR. BRAFMAN:  -- will or will not address.

25              THE COURT:  -- certainly, if you feel that I am, in

1   my comments, I am indicating that I am considering them in a

2   way that you think is inappropriate, certainly let me know.  I

3   understand why he is here and what the counts of conviction

4   are.

5            MR. BRAFMAN:  Thank you very much, Judge.

6            So let me move on.

7            Judge, you know, one of the things that I see in the

8   Government's memo, and, quite frankly, that I didn't see in

9   the Government's memo is they have, in large measure, ignored

10  what I think are a large amount of very powerful, and in many

11  ways, eloquent letters from people who have impacted on

12  Mr. Shkreli in their personal lives and who Mr. Shkreli has

13  impacted on, and they pick one or two facts in the sentencing

14  memo that they don't like and then they deal with it in the

15  way that I don't think does justice to what we've presented

16  for the Court, and I fully expect that Your Honor will treat

17  those letters and give them the merit that they deserve.

18           And let me also reference very, very briefly a

19  report by Dr. Salsberg, which I think Your Honor has obviously

20  reviewed and in your comments today, you've already indicated

21  that it is one of the matters that you will consider and have

22  considered in determining, A, what the appropriate sentence

23  is, and also who Martin Shkreli is and what makes him tick or

24  not tick, on occasion, so let me not spend a great deal of

25  time on that.

1          I just want to address something that the Government

2    did raise.

3          He wasn't picked out of the Yellow Pages, he wasn't

4    picked by Mr. Shkreli, and the Government indicates that they

5    don't challenge his credentials or his background or his

6    talent or his ability -- they say that -- and yet on a

7    footnote, which I consider to be a little bit snarky, they

8    say, We don't know why he was picked, so I will tell you so

9    there's no secret and had they asked, I would have told them.

10   So far today, he was paying about $6,000 for the actual time

11   that he spent, and there is another between 3- and $5,000 that

12   he is owed because he was late in billing, so it's a total of

13   10- or $11,000.  For someone who is considered by virtually

14   all of the people who specialize in this, in this -- in these

15   issues, as one of the best, if not the best, and, you know,

16   how we found him, he was someone very close to the defense

17   team, has a child who is autistic, and he's been the treating

18   physician and analyst for the last ten years and was so

19   impressed with his diligence and his conscientious manner in

20   which he addresses these issues that we thought that is the

21   person who we trust, and the fact that he deals with children

22   primarily is also important because the issues involving what

23   used to be called Asperger's, what is now still called autism,

24   as the doctor writes, is manifested at times in very young

25   children who manifest with learning disabilities and

Proceedings                                    27

1    indications that they are, in fact, autistic but you can

2    outgrow a lot of that.  So he's not prepared, to his credit,

3    even though he's being paid, he's not prepared to say that

4    Martin is, in fact, like Rain Man.  And, you know, that was

5    the reference by one of the witnesses, and despite my probing,

6    I wasn't able to get him to ever say, Yes, Rain Man was an

7    autistic young man in that movie and that's what Martin

8    reminded me of.  Instead he said over and over again that

9    Martin reminded him of Rain Man because of his persistence and

10   because of his fixation on details as the character in the

11   movie.  That's just not true.  I'm not suggesting he came here

12   to lie, but at the end of the day, Judge, whoever ever saw

13   that movie understands what Rain Man was in that picture, and

14   if you watch Martin Shkreli, and if you listen to Martin

15   Shkreli, and if you live with Martin Shkreli, you see awkward,

16   inappropriate social behavior at times that I submit that I

17   don't think he can completely control.  And when Dr. Salsberg

18   tells you what his diagnosis is, Yes, he's depressed; Yes, he

19   has anxiety disorder, they are not legal defenses the crime of

20   securities fraud, and I'm not suggesting that they are.

21          And he also indicates something which is really

22   interesting, and, you know, the Government can't have it both

23   ways.  There is a statement in their memo that struck me as,

24   Wow, this is -- this is who I have to deal with.  They

25   suggested that, look, Dr. Salsberg didn't read the trial

1    record, so how can he analyze Martin Shkreli's behavior that

2    got him to be convicted because he didn't read the trial and

3    he wasn't at the trial.  And what's powerful about that is,

4    first of all, you can't win with that argument, because if it

5    had been at the trial and suddenly his report is right on the

6    money with respect to Aselage's testimony and Richardson's

7    testimony about Martin, what they saw, and what they heard,

8    they will say he has contoured his report to fit the trial

9    evidence, so I think the fact that he didn't see the trial

10   evidence and comes to the same conclusion as Steven Aselage,

11   and I quote you from the record -- I don't have the page, but

12   we all remember it -- Martin believes what he is saying to be

13   true; Martin sees the world through rose-colored glasses;

14   Martin believes at the time he is saying something that that,

15   in fact, is true.  And that's Steven Aselage, who is not a

16   defense witness; he wasn't sympathetic to Martin Shkreli.

17        You also have Richardson and Aselage who tell you

18   that Martin was depressed, that sometimes he slept for days.

19   Richardson talks about his hygiene issues where he had to tell

20   him, Take a shower, had to buy him clothing and Aselage tells

21   us that when Martin came to California for the purpose of

22   engaging in business discussions, he stayed in his hotel for

23   days on end, and when confronted by Aselage, the testimony

24   reveals that Martin indicated that they're trying to adjust

25   his medication, that he has depression.  That's exactly what

Proceedings                                29

1   Dr. Salsberg says.  It's exactly how he characterizes Martin

2   Shkreli.

3            And all I am saying, Judge, is at the end of the

4   day, the Government is suggesting that you take this man who

5   is flawed and somewhat broken and you toss him away, because

6   15 years is a life sentence when you realize that's 39 --

7   let's assume -- he's 34.  Let's assume that he lives and he

8   remains healthy and, as vulnerable as he is, nothing happens

9   to him in the prison.  And among the prayers I say every

10  morning is that nothing happen -- should happen to Martin

11  Shkreli, because in the MDC, he is in a violent place.  He is

12  in a place that several of your colleagues have indicated that

13  reminds them of a prison in a third-world country.  And to his

14  credit, how does he spend his time based on the letters you

15  received?  Nowhere in the Government's memo do they even touch

16  the fact that he treats and helps inmates; that he buys books;

17  that he gets them reading materials; that he has classes in

18  basic math.  He's a good person, Judge; he's not a perfect

19  person; and he has violated the law, but there are so many

20  redeeming qualities in many of these letters that it implies

21  and it powerfully suggests that you find a sentence that

22  allows him, at some point, hopefully relatively soon, to

23  continue to be productive and to continue in the treatment or

24  get the treatment that Dr. Salsberg believes that he needs.

25           And what Dr. Salsberg is suggesting is what I would

Proceedings                                                    30

1   hope we do in an enlightened country with somebody like

2   Mr. Shkreli and that you find a way to hopefully fix him at

3   some point or get him the help that he needs.  He needs

4   treatment; he needs pharmacological treatment, according to

5   Dr. Salsberg and he's not going to get that in a prison

6   facility if you put him there for a long time.

7          And I just want to read something to you, Judge,

8   that -- it's obviously completely ignored in the Government's

9   memo because I don't know how they deal with it.  If they want

10  to say that Martin is a bad guy with the letter you get from

11  Lamark Mulligan, and Lamark Mulligan's letter is at Index 47,

12  and I'm not going to read the whole letter, I know Your Honor

13  has, it's handwritten.  He says, I am currently one of Martin

14  Shkreli's students at the MDC Brooklyn.  And I read further,

15  Martin has been the most positive and influential part of my

16  experience here thus far.

17         I mean, Judge, let me just say that one time:

18  Martin has been the most positive and influential part of this

19  inmate's experience who is at the MDC, and maximum security

20  prison.  He always is excited to teach the glasses.  The

21  impression that he realizes he was wrong and wished that he

22  had never made these mistakes at all and instead wish,

23  obviously -- he talks about his remorse, and at the end he

24  says he has made something as horrific as being incarcerated a

25  positive and impactful learning experience for me and I

Proceedings                                    31

1    believe that says so much about Martin Shkreli.

2              Judge, it does.  It does.  There are a lot of bad

3    people when they get locked up, they ignore the people around

4    them.  Especially if you are not a street person with a

5    criminal record used to being in that facility.

6              And I just want to read one other quote from

7    Exhibit 48, which is the letter that is from Patrick Sickler,

8    also an inmate.  This is the person who Martin teaches chess

9    and always finds a good book for him to read and helpful to

10   the people around him.  But let me read how the letter ends,

11   because he indicates to the Court that his girlfriend had the

12   twins, and they're in the NICU unit, which is a premature unit

13   for treating premature people.

14             Look how sad but eloquent the last sentence is as

15   Martin arranges for his girlfriend to get diapers and wipes.

16   He says, that was the most caring gesture anyone has ever done

17   for my family in these stressful times and shows the character

18   of Martin Shkreli.

19             This is the most caring gesture that this person has

20   ever had, and it's coming from Martin Shkreli who doesn't know

21   him and arranges for them to get help.

22             (Continued on following page.)

23

24

25

Proceedings                                          32

1      MR. BRAFMAN: (Continuing)   You know what, Judge,

2  the fact is that as I was preparing last night I read these

3  letters again.  Because I've read them when I got them, and I

4  read them when I submitted them to the Court, but I read them

5  again.  When we read things again you see things that

6  sometimes you haven't seen.  Sometimes like when you read a

7  good book, when you a reread it you say, I didn't remember

8  that from the first reading.

9          The letter from Mr. McCarthy, Ken McCarthy, Exhibit

10 42.  Ken McCarthy has been involved in education for a long

11 time.  He starts by saying something really cool, but

12 negative, like many people.  My first introduction to Martin

13 Shkreli was through the news media.  He appeared to be a most

14 unsympathetic if not contemptible person.  Now he meets Martin

15 Shkreli, and Martin Shkreli is someone starts watching his

16 videos, education videos.  This is a man who has lectured at

17 MIT, lectured at Columbia, and talks about Martin's videos as

18 the best educational materials he has read.  So he starts

19 writing to Martin at the MDC.  What he does tell you Martin

20 asks him for not, for drugs, not for contraband, not for food,

21 or commissary.  I've been corresponding with Mr. Shkreli since

22 he was incarcerated and his sole interest, besides personal

23 preservation, was to acquire materials to assist him in

24 teaching fellow inmates.  He requested dictionaries, math

25 books, self-help books, which I sent him.  Mr. Shkreli is a

Proceedings                                          33

1   highly unusual, and I imagine aggravating man -- how

2   appropriate -- highly unusual and aggravating man, but I

3   rarely in my 35 years as an educator encountered an individual

4   with the depth of sincerity towards uplifting others through

5   education.  He has potential to do good.

6          What I'm asking at the end of the day when I finish,

7   and I'm getting there, Judge, is that you will allow his

8   potential to be put to good use.  In the end of the day isn't

9   that what we are supposed to do under 3553, punish someone but

10  also see if there is a way to use their potential for the

11  benefit of society.

12         Your Honor, I have to refer respectfully to just a

13  couple of other issues, which I think are very important for

14  you and for the record but also quite frankly for Martin.

15         First, Judge, is a statement by the defendant's

16  brother, it's Exhibit 3.  The defendant's brother is 30 years

17  old.  He lives at home with his parents.  And he writes at the

18  end of his letter a line that I think is just wonderful.  As

19  good and bad as it is, it's just perfect.  At the end of the

20  sentence, Exhibit 3, page two, he says, "I think Martin may be

21  difficult to understand simply because there really is no one

22  else like him."

23         Judge, doesn't that ring true in many ways?  I don't

24  know that I've ever met anyone exactly like him who is as

25  driven as he is, who is as smart as he is.  Yet I'm standing

Proceedings                                           34

1   in the well of sentencing court trying to save his life,

2   that's a dichotomy which is almost inexplicable.  And I think

3   when you look at the beginning of our sentencing memorandum

4   when we refer to the observations of Dr. Salsberg.  I think

5   you see some of the comments by Dr. Salsberg where he tries to

6   unravel this mystery.

7           You know what is unfortunate, the Government in

8   their sentencing memo has cherry-picked from among thousands

9   and thousands of e-mails by the defendant.  They have

10  essentially taken a couple of statements that he has made, and

11  the person he's speaking to, that he's writing to, is a woman,

12  that the person he's speaking to is writing a book about him.

13  He's lonely.  He's at the MDC.  He says a couple of things

14  that they seize on.  At the end of the day I don't know

15  anybody, including all the people in the well of this

16  courtroom, who would be able to survive that test.  You take

17  all the e-mails I've written in the last two years, and you

18  take one snippet here and one snippet there, I think you'll

19  find a couple of things that don't reflect well on me.

20  Because maybe it's an offhand remark, maybe it's something

21  that I'm not proud of having said, maybe it's something that

22  is just embarrassing that happens.

23          Especially when you are incarcerated and you are

24  alone and you are trying your best to maintain your sanity and

25  someone starts to write to you, and visit you, and starts to

Proceedings                                            35

1    try and develop a relationship with you, at the end of the day

2    you don't use that to suddenly decide that that demonstrates

3    that they are not remorseful.

4          You don't have references to the powerful letters

5    from other -- the Government doesn't references the powerful

6    letters from others that indicate that he is remorseful.

7          I also think part of the problem with Martin Shkreli

8    is the persona that he tried to develop in the media, in the

9    YouTube world, in the Facebook world, cuts against him, hurts

10   him dramatically.  I hear what your Honor is saying that

11   you're not going to seize on them to impact on the sentence

12   that you are going to impose, but in some respect the

13   Government has.  In some respect the Government has urged you

14   to use things that are not necessarily reflective of who he

15   really is and actually use that to punish him.

16         You know Dr. Trachtman wrote a letter.  The letter

17   arrived only last night and we provided it to the Court and

18   the Government immediately.  He's a brilliant man.  He's a man

19   who is involved in medical research.  He knows Martin.  He

20   sees his potential.  He suggests if there is a combination of

21   punishment and community service where it's regulated and

22   monitored, he's closely supervised, he can do wonderful things

23   because that's the way his mind works.  He's able to find

24   economical solutions to rare diseases that most people ignore

25   and that Martin is fixated on.

Proceedings                                    36

1          I want to read something from one last letter,

2   because it's important for two reasons.  If your Honor will

3   recall, obviously we didn't have this letter at the time, we

4   made a conscious decision to try and not confront some of the

5   people who we didn't know prior to trial, whether they were

6   adversarial witnesses or Government witnesses, we didn't want

7   there to be any suggestion that we're getting in the way of

8   witnesses.  But there was a man who was referenced, I think in

9   the testimony of Aselage.  It's a statement by Mr. Aselage I

10  think used to suggest that Martin is mean, that Martin is

11  inappropriate, that Martin goes out of his way to try and hurt

12  people who don't need hurting.  And Dr. Aselage referenced a

13  meeting in which Dr. Horacio Plotkin was criticized by Martin

14  and yelled at by Martin and cursed by Martin and made to feel

15  like he had no self-worth.  That was in the trial record.  It

16  had no relevance, in my opinion, other than to suggest that

17  Martin is a bad guy.

18          Now we have a letter to address to your Honor, as I

19  think you know, from Dr. Plotkin.  It's important for two

20  reasons.  First of all, Dr. Plotkin discusses how he was in

21  fact yelled at.  And he indicates that he knows that

22  Mr. Aselage mentioned it during the trial.  And he says that I

23  was that person.  For the record, Martin didn't shout at me,

24  he blamed me for missing some deadlines.

25          When you are in business and you have these meetings

Proceedings                    37

1    and you have people who are supposed to comply with certain

2    deadlines and they commit those deadlines, I think it's okay

3    for voices to be raised on occasion.  But this wasn't an

4    effort by Martin to belittle a scientist.  The important part,

5    the second part, of Dr. Plotkin's letter is even more

6    important, because he talks about the acts of extraordinary

7    generosity that Martin performed that Dr. Plotkin is aware of.

8    He talks about a baby in Venezuela who needed a medication

9    that wasn't available.  Martin arranged for it to be purchased

10   for a year for this baby.  A little girl in Boston who is

11   blind and autistic, Martin agreed to pay for her treatment but

12   the family turned it down.  They thought it was too much

13   money.  Martin bought a wheelchair for a little girl who

14   suffered from PKAN disease.  At the end of the day he knows a

15   lot about Martin.

16          I need to mention something because the Government

17   is wrong as a matter of law.  Five or six times in their memo

18   they suggest that these acts of civic kindness or charity or

19   acts of kindness don't rise to the level of being so

20   extraordinary that they qualify as I downward departure under

21   5H1.1.  We don't need them to qualify as a downward departure.

22   One of the things about the guidelines, in my personal opinion

23   with all do with respect to the Commission, in order to meet

24   that threshold you had to be Mother Theresa, who had to have

25   lived your whole life just doing good to meet the standard of

1    extraordinary circumstances if you wanted to the Court to

2    consider it.

3            We're asking for a variance.  We don't need to meet

4    the legal threshold of downward departure.  They say it over

5    and over again, that will act of charity doesn't rise to the

6    level of extraordinary circumstances.  That act of kindness

7    doesn't amount to -- but it tells you something.  It tells you

8    something.

9            When Martin talks for hours and hours and hours to a

10   rape victim, who he doesn't know, and who I won't identify,

11   and helps her through the most difficult time of her life to

12   the point where she feels it necessary to tell you about it.

13   He's comforting a stranger who's gone through trauma.  It's

14   not just I'll help you or I'll write you a check.  It's day,

15   after day, after day.  She stays on the phone.  He counseled

16   her and comforts her.  Most people don't do that.

17           It's something worth repeating, Judge, most people

18   don't give of themselves that way.  In the case that we cite,

19   I remember, which is the Third Circuit, I thought that was a

20   pretty good circuit and close to this district.  But when we

21   cite Zafiro as a case where the Court specifically pointed out

22   that helping someone with your time and effort is more

23   significant than a rich person writing a check to a charity,

24   the Government's response is that's not a case in this

25   Circuit, that's the Third Circuit.  Yes, it's the Third

Proceedings                                     39

1    Circuit, but it's a case where District Court instructs all of

2    us that when someone does what Martin Shkreli appears to have

3    done over and over and over again, that at the time of

4    sentencing, as Judge Raykoff said, if ever there is a moment

5    when a judge is supposed to give a person credit for the good

6    things that they have done in their life, it's on the moment

7    of judgment day, where that stuff should count.

8           I submit that Martin Shkreli over and over again has

9    demonstrated to this Court and through these letters that

10   despite all of the nonsense and the stupid stuff that he does.

11   And the stuff that gets him, you know, not in necessarily

12   legal trouble, but gets people to write about him and talk

13   about him, that is not the whole picture.  That the whole

14   picture, as I think you know, your Honor, from these letters,

15   is a very, very, very different picture.  It's a picture that

16   is extraordinary in many ways, even if you don't need the

17   downward departure level of extraordinary circumstances.

18          I'm almost done, your Honor, thank you for your

19   patience.  I'm trying not to belabor the issue.  But after I'm

20   done, pretty much the Government speaks, then Martin of speaks

21   and your Honor will decide the fate.  I don't want to leave

22   stuff on the table that I think is just too important not to

23   stress.

24          So I respectfully refer the Court to Exhibit 28,

25   which is a letter from Petro Machado.  I don't know him; I

Proceedings                                    40

1   never met him.  He wrote a letter to the Court.  He is

2   somebody who is an investor, who invested, who made a lot of

3   money, but that's not the import of his letter.

4            The last paragraph is talking about him having a

5   very serious, incurrable disease, Multiple Sclerosis.  The

6   last paragraph he says -- I'm sorry, the second paragraph, he

7   says, during these past few years until Martin's latest

8   arrest, I've come to know him relatively well.  I feel I have

9   a valid opinion to share with, your Honor.  My definition of

10  Martin would be he's a genius but extremely misunderstood.

11  Unfortunately for him, I believe he is to blame for that

12  misunderstanding.  Again, a cogent observation.

13           But look at the last paragraph, respectfully.  What

14  I as a patient with an incurable, devastating disease like

15  hundreds of millions of others around the world ask, is that

16  Martin be punished in a way that makes society benefit from

17  his mental capacity.

18           That's what I'm asking you to do.  Sentence Martin

19  in a way where he's not warehoused, where he has no treatment

20  and no access to being able to use his real talent to help the

21  people who need him most.  But use the sentencing discretion

22  that you have to fashion a sentence that is consistent with

23  the mandate, sufficient but not greater than necessary.

24           Whether that's the 18 months we ask for, or 24

25  months or 36 months; it can't be it, just can't be the 15

Proceedings                    41

1    years that the Government is requesting for.  That is a

2    horrific draconian sentence.  That in this day is really used

3    for recidivists or people who have essentially created a

4    career of criminal conduct that ends with a draconian

5    sentence.  Where a judge like you, says, it's enough, we're

6    going to put you away forever and that's what 15 years

7    suggests.

8            Judge, you know at the end of the day, the sentence

9    from the inmates are, I think, very, very, very powerful and

10   instructive.  Here is a man who has never been in jail before,

11   who is put into an environment where if the Government really

12   checked to see what goes on there they wouldn't come up with

13   the snippet of conversation.  They would realize that Martin

14   has suffered the serious lockdowns as a result of violence by

15   other inmates where the whole institution has to be

16   punished -- not being critical of the Bureau of Prisons,

17   that's their job to maintain order.  But it's one thing to

18   read about violence, one thing to see it on television, and

19   one thing to be surrounded by it 24/7 in a way that is

20   powerful and frightening.

21           When Martin tells the world in the midst, I'm doing

22   okay, it's because he doesn't want his parents, who have their

23   own concerns, to stay up at night worrying.  He's not okay;

24   he's in a violent place.

25           I understand he brought this upon himself.  I'm not

Proceedings                                42

1  blaming you.  But I'm suggesting that as a result of that

2  remand, it's something we will address in the letter to the

3  Court after the sentencing before the judgment of conviction

4  is finalized when we ask for a recommendation, but as a result

5  of being remanded, based on the BOP's expert that we put

6  forward, an affidavit from Joel Sickler.  Martin now is deemed

7  to be a safety concern.  So that as a result, he is no longer

8  in his judgment, absent some movement, he is no longer

9  eligible to be serving his time in a camp.  The difference is

10 extraordinary between a camp and even a low.  And that's as a

11 result of him being remanded and being classified on that

12 remand as a danger to the community.  What otherwise would be

13 a voluntary surrender and a camp facility, that he would

14 certainly qualify for as a first offender in a non-violent

15 place, he will most likely serve his sentence in another

16 violent place.  And I ask, your Honor, to factor that into the

17 equation.

18          THE COURT:  Are you asking me to vacate my prior

19 findings about the reasons that I remanded Mr. Shkreli?

20          MR. BRAFMAN:  I'm going to be asking you that in a

21 letter to the Court after the sentencing.  A lot depends on

22 the severity or lack of severity of the sentence.  Because

23 depending on the size of the sentence he may or may not be

24 eligible for a more modified level of security.  So I'm not

25 asking for it today.  But what I am asking for today is that

Proceedings                                          43

1   when you decide how much more time Mr. Shkreli has to serve, I

2   want you to know that he's already served six months in

3   equivalent of a maximum security prison.  And that's hard time

4   and it's a dangerous place.

5           Even though we did not come here two weeks after he

6   was remanded and beg you to release him.  We did not revisit

7   the issue of his remand in the last six months.  We did not

8   want to burden the Court or ask you to change your mind; we

9   accepted it.  I think probably from Martin's perspective he

10  now understands your Honor's decision better than when he made

11  the stupid comment; and so do I, quite frankly.

12          And at the end of the day, it's one thing to say to

13  a defendant I'm sentencing you to 36 or 60 months and you're

14  eligible for a camp.  I'm going to recommend the camp, and you

15  go to a camp, and everybody around you is a white-collar

16  person who has no violence in their history, and they are sit

17  around all day playing chess.  And Martin Shkreli is in a real

18  prison.  Martin Shkreli didn't commit a violent crime so that

19  the rest of his sentence should be factored into that security

20  level, but that's for another day.

21          What I'm trying to suggest, Judge, is that when you

22  sentence Mr. Shkreli, it's real prison.  So far it's been real

23  prison.  I don't think that Mr. Shkreli despite the fact that

24  sometimes he says stupid things and despite the fact that

25  sometimes he does stupid things, when at the end of the day

```
                        Proceedings                      44
```

1  Martin Shkreli doesn't belong there.  He certainly doesn't

2  belong there for a significant period of time.

3          I want to end with just one observation.  I

4  appreciate the fact that the Court has allowed me to go on for

5  this long.

6          The Government suggests that Martin Shkreli doesn't

7  have remorse, that Martin hasn't expressed remorse.  I want to

8  also reference some of things they said that they want you to

9  hold against Martin.  For example, when he said to the media

10 when we walked out the building, and I want to shoulder part

11 of the blame for that.

12         When we got the verdict, I submit with the great

13 respect, that everybody in this courtroom was a little bit

14 stunned.  I think we were stunned because the fact is that the

15 baggage that he came to the table with, we were concerned that

16 even if we tried a good case, even if we presented evidence,

17 it was too powerful to overcome.  I said so much in my

18 summation.  I was hoping they wasn't use the Shkreli current

19 to drown out all the reasonable doubt.

20         When we left the building, and at the time before we

21 really had an understanding of how your Honor would compute

22 the loss.  There were those among us, despite all of our

23 experience, that believed there might be a way to calculate

24 the loss, that there might be a zero loss, there might not be

25 a 20-level enhancement.  Because he was acquitted of,

Proceedings                                    45

1    everybody saw the main money count.

2            So, yes, we left the building.  We felt good.  And

3    Martin was grinning into the camera, and so was I to be

4    perfectly candid.  Because at the end of the day, I've had a

5    lot of acquittals in my life in this building.  I felt very

6    proud of the work in the Shkreli verdict.  And to be honest

7    with you, I think it's some of the best work that we

8    collectively did, and we were very proud.  When we left the

9    building, in that euphoric moment, yes, you can see Martin

10   Shkreli grinning.  You can also see the Government standing

11   with long faces and very upset, despite the fact that they had

12   three counts of conviction.

13           We get beyond that.  It's now six months, seven

14   months after the verdict.  Martin has had remorse smacked into

15   his head everyday that he wakes up and he's not able to leave

16   his cell, or he's not able to take a shower, or when he's told

17   when he can go to the bathroom, or when he see another inmate

18   knife another inmate, and he's an objector until the whole

19   thing gets resolved.

20           He understands and we've explained to him, that you

21   are -- we are going to be filing an appeal.  You have a right

22   to appeal.  And this is one of the most interesting cases, I

23   think, we've ever been involved with.  There may be some live

24   issues, in our opinion.  And at the end of the day you have to

25   be careful of how you express remorse.  So you can't say, I'm

Proceedings                                46

1    guilty and I should go to jail, and I'm really sorry.  Because

2    if you do of that the Second Circuit will use it, quite

3    frankly, and it's there.

4          So to the extent that Martin hasn't expressed the

5    kind of I'm sorry that the Government demands, I'm sorry that

6    he hasn't done that.  Blame lawyers who are trying their best

7    to preserve his legal issues.

8          Judge, I'm done unless you have specific questions.

9          I don't know what you're going to do.  I've been up

10   for days thinking about it and worrying about it.  And I come

11   to the courtroom in somewhat of awe by the responsibility.

12         I have a friend who's an oncologist.  He said to me,

13   you and I have a lot in common.  I said what?  Well, no one is

14   ever happy to come into your office and no one is ever happy

15   to come into my office.  I said, I've never really understood

16   that, but I don't think we have anything in common in a

17   practical matter.

18         When you lose, they die.  The family thanks God for

19   your effort.  When we have a bad result, we have done our

20   best, we don't have the ultimate power to control, but

21   sometimes despite your best efforts, despite your skills and

22   despite what should be a good result you don't get to make the

23   final decision even if you're able to do the job that you're

24   supposed to be doing.  Then if you're right, it's good.  And

25   if you're not right, you get letters for a long time.  And you

Proceedings                                    47

1  watch a very good person essentially die a slow death in a

2  place where hope is just not present.

3          And the interesting part is that with Mr. Shkreli in

4  the MDC I've seen him do good for people, in a hopeless

5  position.  If he can do it there, he do it in a hospital, he

6  can do it in a research lab.  We've indicated that he wanted

7  to work with people when they are released from prison because

8  he understands what it's like to be in prison.  We've had

9  discussions with an agency who does that.  And they don't us

10 to use their name because they haven't been able to personally

11 interview Mr. Shkreli, but that's what would happen.

12         If you accept our recommendation that you impose a

13 sentence that is a reasonable period of incarceration, and

14 reasonable, obviously, is something that only you can decide.

15 And then you couple that with what we suggest to be thousands

16 of hours of important community service, done under the power

17 and control and supervision of the Probation Department and

18 supervised release people, so you know that they are reporting

19 on his work and his progress.  And you impose that as a means

20 to ensure that somehow the world benefits from someone who has

21 this potential.

22         I think, as many of the people have written you

23 suggests, I think it's better result certainly for Mr. Shkreli

24 but for a lot of other people who feel the same way, who don't

25 know him necessarily and yet have asked you to do exactly

Proceedings                                      48

1    that.

2              Thank you, your Honor.

3              THE COURT:  Thank you, Mr. Brafman.

4              Who would like be heard on behalf of the Government.

5              MS. KASULIS:  I would, your Honor.

6              Just before I proceed in the normal course, usually

7    the Government is responding to what the defendant said.  So

8    in the event that once Mr. Shkreli speaks, if the Government

9    does feel it needs to respond to one or two points, we ask the

10   Court's permission to do so.

11             THE COURT:  Yes.

12             MS. KASULIS:  May I approach the podium, your Honor?

13             THE COURT:  Yes.

14             MS. KASULIS:  Your Honor,, this Court has presided

15   over two trials in this case and the parties have made very

16   fulsome sentencing submissions.  So I'm not going to belabor

17   and do a rehash of everything that we argued already.

18             I do want to do the same that Mr. Brafman did, to

19   thank the Court for her attention to detail, to take the time

20   to be prepared throughout the entire course of these

21   proceedings.  We, as the Government, very much appreciate your

22   efforts, your Honor.

23             There are a few points that I would like to respond

24   to from what Mr. Brafman argued to the court today.

25             THE COURT:  Would you start why you think 15 years

Proceedings                          49

1    is reasonable; and what Mr. Brafman has described.

2           MS. KASULIS:  We think the 15 years is reasonable.

3    And you know, your Honor, it's not typical for our office to

4    deviate from recommending a sentence within the guideline

5    range.  So we didn't just make that number up.  We think it's

6    appropriate for a number of reasons.

7           I think the first is that Mr. Shkreli is a convicted

8    criminal.  We didn't say, oh, your Honor, he needs to be

9    sentenced to 15 years because he's called the most hated man

10   in America, he's difficult, or off, or strange.  We are

11   recommending that sentence because he was convicted of three

12   of the four fraud schemes for which he was charged.  And your

13   Honor found by a preponderance that the Government proved that

14   he did in fact commit the fourth fraud scheme with which he

15   was charged.  And those fraud schemes were over the course of

16   five years, your Honor.  It was to the tune of millions of

17   dollars of loss with respect to each one of those frauds.

18          So this is not an isolated lapse of judgment, for

19   example, that one may argue took place in an insider trading

20   case, for example, or one pump-and-dump scheme that the

21   defendant is responsible for.  This is four different fraud

22   schemes over the course of five years, that was act, after

23   act, after act, after act, lies and deceit in furtherance of

24   each of those schemes.  That is why, in part, we believe that

25   15 year sentence is appropriate.

Proceedings                                50

1          Secondly, your Honor, as part of 3553(a) analysis

2    what is also important are the history and characteristics of

3    the defendant.  That is also critically important here.

4          Because time and time again, Mr. Shkreli seems to

5    not understand exactly why he's here, the magnitude of the

6    crimes that he's committed, and he has no respect whatsoever

7    for the law or for this process, for any of these proceeding

8    that have taken place before the court.  And what Mr. Brafman

9    wants to do is say, your Honor, please just focus on the good

10   acts, don't look at everything else that Mr. Shkreli has done,

11   all the bad acts, all the things that he has said, just look

12   at the good things, your Honor, because that is who

13   Mr. Shkreli is.  What people have said about him is what you

14   should consider, not Mr. Shkreli's own words, his own acts.

15         All of that is fair game, your Honor, for, your

16   Honor, to consider what he did.  And that is the record that

17   you have before you.  That is the best indicator, Judge, of

18   who Mr. Shkreli is.  And it's the best indicator of what he is

19   going to do in the future.  It is his whole life up until this

20   very point in time, what he has done, and what he has said.

21   And that, your Honor, is what we're relying upon.

22         As you know, our sentencing submission frankly could

23   have been a lot worse, Judge, but what we really tried to do

24   here is focus and rebut the image that Mr. Behalf had painted

25   to the Court as to who Mr. Shkreli is.  There is so much more

Proceedings                                    51

1  in the public record.  We can go through the years of tweets,

2  et cetera, that we could have.  We really tried to focus,

3  Judge, on what Mr. Shkreli has said and done that paint a

4  broader picture, a more accurate picture, of who Mr. Shkreli

5  is.

6          Your Honor, we're not saying that he is a bad person

7  with a capital B.  Or that he is the devil.  Or that you

8  should just ignore the fact that he has done good acts.  He

9  has done good acts.  If anything, his good deeds show that he

10 has the capacity to make good choices; he just choses time and

11 time and time again not to do that.

12         I do want to focus, your Honor, on what Mr. Shkreli

13 in fact did in this case.  We have said over and over again

14 that he lied repeatedly with impunity to countless victims.

15 He violated people's trust.  These were not just knee jerk

16 reactions, not a moment in time, statement that he made in

17 response to stress.  This was something that he did time and

18 time again.  He tailored those lies.  He tailored what he said

19 to each victim, because he knew what they wanted to hear.  He

20 knew what he was doing.

21         This was not about just looking at the world through

22 rose-colored glasses and saying the same thing over and over

23 again to each of his victims.  He knew what he was going to

24 say to each person to manipulate and pull the wool over their

25 eyes.  And that's in fact what we proved at trial that he did.

Proceedings                                        52

1          These are not victimless crimes.  He stole from his

2    investors.  And then your Honor found by a preponderance that

3    he in fact stolen million dollars from Retrophin, the company

4    that Mr. Brafman characterized as his baby.  He stolen million

5    dollars from his baby.  That money could have gone to research

6    and development to cure the very diseases that Mr. Shkreli

7    supposedly feels so passionately about, devoting his life's

8    work to.  That's what that money could have gone to, not to

9    cover up his fraud as he continued to dupe people and hide the

10   crimes.

11         These are not victimless crimes, Judge.  He was

12   successful in covering up his fraud.  And then Retrophin

13   ultimately became successful enough that he could steal that

14   money and pay people back.  This is not a victimless crime.

15   The Government contests the characterization of these crimes

16   in this case, as having no victims whatsoever.

17         This case is also about why Martin Shkreli stole

18   money for his personal benefit.  We've heard time and time

19   again that he didn't buy a fancy house, he didn't buy fancy

20   cars.  We submit, your Honor, he did in fact steal the money

21   for his personal benefit.  Because what motivated Martin

22   Shkreli is his own image.  That image is so important to him.

23   He in fact even referenced his own image and the importance of

24   his own image in his letter to the Court.  He wants everyone

25   to believe that he is a genius, a wiz kid, a self-taught

Proceedings                                      53

1   biotech wonder, the richest man in New York City.  Without

2   that image, Martin Shkreli is nothing.  That image is

3   everything to him.

4          Under no circumstances can he be just an average

5   person who fails like the rest of us, who has to take

6   responsibility for his actions.  He needs to be mythical and

7   larger than life.  He needs to be a rags to riches story.  So

8   that image, we submit, your Honor, that image is his mansion,

9   it's his Maserati, it's his cars.  Cultivating that image is

10  what is important to him above all else.  Because he is

11  stealing money for his own benefit or he stole that money for

12  his own benefit, he is no better than any other fraudster.

13         I also want to address the notion that Mr. Shkreli

14  will never commit fraud again or that he is in fact truly

15  remorseful.  This is a man who said mere months ago, your

16  Honor, in e-mails that he knew that we had access to and that

17  we could read.  This is a man who said he will, quote, do

18  everything and anything to get the lowest sentence possible,

19  except for giving up the handful of Constitutional rights he

20  has.  He knew we were going to see that, your Honor.  He said

21  it any way.  It's because it's what he believes.  What he

22  wrote to the Court is I think nothing more than a half-hearted

23  attempt to convince, your Honor, that he's actually remorseful

24  and sees the errors of his ways.

25         But what is so evident from his letter, Judge, is

Proceedings                                      54

1   it's the same refrain we hear time and time again from

2   Mr. Shkreli, about it's everyone's else fault, I'm

3   misunderstood, I could see how out of context what I said may

4   have mislead people, it wasn't my fault, it has nothing to do

5   with me.  And, your Honor, I think we've just proven at trial

6   it's absurd, absurd, for him to maintain that position and to

7   standby what he's saying to the Court.  He refuses to take

8   responsibility for his actions because he doesn't want to.  He

9   doesn't think that he did anything wrong, because he thinks

10  he's different and better than the rest of us and the rules

11  shouldn't apply to him.

12          What is the clear from Mr. Shkreli's conduct leading

13  up to the trial, during the trial itself, and after the trial

14  is he has no respect for this process.  He mocked the victims.

15  He mocked the prosecution during the trialed.  And your Honor

16  issued her order to prevent him from doing that.  He did, your

17  Honor, behave after that.  Because Mr. Brafman's team, very

18  admirably, made sure that a member of their team was with him

19  at all times in the courthouse.  He had to be babysat in order

20  for him to make sure that he could actually behave per the

21  Court's order.

22          I also want to make clear that Mr. Shkreli is not a

23  child.  Mr. Brafman wrote, stated, quote, he's fundamentally a

24  good kid who sometimes does aggravating things.  Mr. Shkreli

25  is about to turn 35 years old.  He's not a child.  He's a man.

Proceedings                                    55

1   He's not a teenager or a college kid who just needs mentoring,

2   guidance, and focus.  He's a man who needs to take

3   responsibility for his actions.

4            After his verdict he immediately resumed attacks on

5   the criminal justice system.  He mocked the jury who sat and

6   heard and focused for a six-week period of time and did their

7   job admirably.  He had went back to harassing people online.

8   And, your Honor, correctly ruled that what he was doing in

9   fact posed a danger to the community.  He even stated that

10  your Honor was just going to give him a slap on the wrist.  He

11  stated that openly, he knew your Honor would hear it.

12           And again, we go back to the e-mails.  Because I

13  think the e-mails are so telling, your Honor.  Those e-mails

14  were up until the mere weeks ago.  He says things like, he's

15  going to get probation, a light sentence, he'll serve his time

16  in Club Fed.  He basically assumes that, your Honor, is going

17  to be fooled by his gestures towards remorse.

18           Those e-mails are devastating because they are true

19  snapshot of what Mr. Shkreli actually believes.  This is him.

20  He needs to be sentenced for who he is.  You can't say, ignore

21  this, but think about that.  This is Martin Shkreli, the good,

22  the bad, and the ugly.  This is the record that is before your

23  Honor, when, your Honor, is considering how to sentence him.

24  This is the man.  These are the actions.  These are the words

25  that, your Honor, must consider in rendering her sentence.

Proceedings                                56

1        He continues to think that this is all just one big

2   joke, that, your Honor, is going to give him a slap on the

3   wrist.  MDC does not seem to have affected him.  He thinks

4   he's getting out in six months.  He's going to do his time and

5   get out of jail tomorrow, and that's that.  But, your Honor,

6   what we submit is a significant jail sentence of no less than

7   15 years, is appropriate because the public needs to be

8   protected from Martin Shkreli.  We do believe, your Honor,

9   that he is dangerous, that he victimizes people without

10  thinking twice about it.  That he still maintains to this day

11  that the ends truly do justify the means.

12        And he does not deserve special treatment, your

13  Honor, from this Court.  With respect to the psychological

14  examination, we didn't even think we needed to get our own

15  examination of Mr. Shkreli.  Because, frankly, what the report

16  said is there is really nothing wrong with him.  He suffers

17  from depression and anxiety, as many, many, many high

18  functioning people do, your Honor, who are smart and who have

19  stressful jobs, who live in New York City, who experienced

20  9/11.  He's no different than many, many people.  And those

21  conditions of anxiety and depression do not warrant committing

22  crime.  They don't excuse it.

23        Just to be clear, Mr. Shkreli is getting

24  pharmacological treatment at the MDC.  That is something that

25  is contained in the PSR.  He's also an individual who's

Proceedings                                                      57

1   upbringing may have been challenged, just as many people's

2   upbringing was challenged.  Many people have old-world

3   parenting styles that they dealt with in their youth.  But

4   what we do know is that Mr. Shkreli has had the unwavering

5   support of his family.  They are here in the courtroom.

6   Mr. Shkreli's father was here throughout the trial.  And

7   that's a lot more, frankly, your Honor, than a lot of

8   defendants have in this courthouse.  What was particularly

9   alarming about the psychological evaluation was that it was

10  clear that Mr. Shkreli cannot tolerate failure and will

11  instead lie and rationalize his failures to perpetuate his

12  self-image.  That is devastating, your Honor.  And we urge,

13  your Honor, to strongly consider what Dr. Salsberg said about

14  Mr. Shkreli's mental makeup, how he reacts to situations that

15  challenge that self-image.  That's not a mental health issue.

16  It is a personal characteristic of the defendant and it does

17  not appear that he has any desire, whatsoever, to change that

18  character.

19          There have been some reference, your Honor, to not

20  incarcerating Mr. Shkreli to a significant term of

21  imprisonment because the future of mankind with respect to

22  curing terrible diseases hangs in the balance.  And he has all

23  this potential.  The Government's position, your Honor, is a

24  significant term of imprisonment is not going to deprive the

25  world of cures to multiple rare childhood diseases.

```
                      Proceedings                    58
```

1           There was a letter that Mr. Brafman quoted from an

2    individual, Pedro Machado, who does in fact himself have an

3    incurable disease.  I do want to note, your Honor, that

4    Mr. Machado did in invest in Retrophin.  He invested $400,000

5    in January 2013 and that money went directly to Mr. Greebel,

6    his co-conspirator, and his crimes to pay his outstanding

7    bills.

8           If you look at record before you, the only reason,

9    your Honor, we even brought up the drug hike -- and I think we

10   really tried not to make that a focus of this trial.  I don't

11   think it was a part of the trial, period.  We didn't try

12   through multiple maneuvering to put it before the jury, when

13   frankly we probably had a bases to raise it considering some

14   of Mr. Brafman's arguments about Mr. Shkreli.  But we didn't

15   want to do that.  We wanted this case to be about the crimes

16   that Mr. Shkreli committed, not Mr. Shkreli in the public

17   arena.  But we did bring up the drug price hike issue, your

18   Honor, because it is clear from Mr. Shkreli's own words that

19   what motivates him in the working drug world is making money.

20   That's what he said.  He can't get away from those statements,

21   because that is what he said, that is what he means, that's

22   what he's proven that he believes time and time again.

23          He may have some good idea.  He may be very smart.

24   We're not challenging that.  But what we have seen as well is

25   that he lacks the ability to follow through on those ideas.

1   That's what his companies in the aftermath of Mr. Shkreli have

2   attempted to do, to pursue those FDA trials, to try to get

3   these drugs to market for people who really need them.  Once

4   Mr. Shkreli actually is steps aside and lets them to do what

5   they need to do, to try to help the patient population.  And

6   there is nothing illegal about what Mr. Shkreli did with

7   respect to the drug hikes.  But I just want to be clear that

8   we should all recognize that Mr. Shkreli is not somebody who

9   is purely altruistic and is here to save mankind.  That he's

10  in fact going to make sure that all of these incredibly

11  vulnerable people who are facing horrible situations with

12  respect to themselves and their children, that he is going to

13  be their savior.  He's not that person.  It's an insult to the

14  doctors and scientists who spend their whole lives trying to

15  cure and treat the diseases without trying to line their own

16  pockets in the process.

17          With respect to the letter from Dr. Trachtman that

18  was submitted to the Court last night.  We do want to note for

19  the record that Dr. Trachtman is, quote, the Martin Shkreli

20  Professor of Pediatric Nephrology NYU.  We do urge, your

21  Honor, to read his letter through that lens.

22          THE COURT:  Do you mean that Mr. Shkreli funded his

23  position?

24          MS. KASULIS:  That is right, your Honor.

25          My final point is this, Judge, this case is also

Proceedings                                                      60

1    sending a broader message.  It's about sending a message to

2    our society that you can't lie to people for years and rip

3    them off and then steal from somewhere else to pay them back

4    and it's just all okay.  That's a message that needs to be

5    sent, Judge.

6              Another message that needs to be sent is that you

7    had can't make a mockery of our Criminal Justice System.  That

8    you then you can't steal from people and lie and claim that

9    you're special and you then get to avoid the consequences of

10   the course of your actions.  You don't get to cherry pick who

11   you are before the Court.  You have to stand before the Court

12   as a whole.  You have to own all of who you are when you stand

13   before the Court and face a sentence.  And you can't

14   manipulate this Court to get out from under your crimes.

15             So Mr. Shkreli made the choice over and over again

16   to lie for years to benefit no one but himself.  He's not a

17   child.  He's a full-formed man.  And he needs to be stopped.

18   Society needs to be protected.

19             And that is why, your Honor, we believe that a term

20   of imprisonment of no less than 15 years is appropriate here.

21             Thank you, Judge.

22             THE COURT:  Thank you.  Mr. Brafman or Mr. Shkreli,

23   do you want to be heard at this time?

24             MR. BRAFMAN:  Would you object if he were able to

25   sit down?

Proceedings                                    61

1           THE COURT:  That's fine.  You can speak from the

2    table.

3           THE DEFENDANT:  Thank you, your Honor.  Your Honor,

4    thank you for the opportunity to speak directly to you.

5           Before I continue, I want to acknowledge my family

6    and friends, many of whom flew across the country to be here.

7    Thank you for your support.  My mother, who I haven't spoken

8    to for sometime, I love you.  I miss you.  Please don't worry

9    about me.

10          Grave mistakes, poor judgment have led me to be here

11   today.  My biggest regret is getting good and innocent people

12   mixed up in my bad conduct, my mistakes.  To me a mistake is

13   something you wish you never did, because you knew it was

14   wrong at the time.

15          I made many mistakes imaging the MSMB funds.  I look

16   back and I'm embarrassed and ashamed.  I'm not sure I

17   recognize the person who wrote the $35 million AUM email in

18   2010.  I have to live with that mistake and its consequences.

19          What led me to write that e-mail, as I believe the

20   prosecution's absolutely correct, or as importantly to not

21   send, follow up e-mail, correcting or explaining.  It's a

22   painful embarrassment.

23          I was never motivated by money.  I wanted to grow my

24   stature and my reputation.  I know now that when you e-mail

25   something that looks direct, but you know the truth is

Proceedings                          62

1   something requiring explanation, you owe it to that person to

2   explain it so they know everything you know and they are not

3   mislead.  That's just one example of my disgraceful judgment

4   at this time.

5           In the 2015, years after MSMB, I started a new

6   pharmaceutical company based with the major fundraising I took

7   no chances.  While our PPM had risk disclosures, I demanded

8   every investor sign and initial every page of the supplemental

9   disclosure detailing SEC and DOJ investigations, Retrophin

10  lawsuit, which mirrors the Indictment in this case.  We ended

11  up raising $100 million, which at the time was the fifth

12  largest financing for a new drug company funded almost

13  completely by Retrophin's largest investors who were happy

14  with my success at that company.

15              (Continue following page.)

16

17

18

19

20

21

22

23

24

25

Proceedings                                         63

1          MR. SHKRELI:  (Continued)   I'm telling you this

2     long story because I've learn.  I'm not the same person I

3     was during the MSMB era.  I know right from wrong.  I know

4     what it means to tell the truth and what it means to lie.

5     My intuition and experience has grown substantially since

6     then.  I still have work to do to ensure that I complete

7     this improvement and resolve the other issues and feelings.

8     I am very pleased to hear that the Court is not holding my

9     personality on trial.  I am here because of my gross,

10    stupid, and negligent mistakes I made at MSMB.

11          This would be a good time to apologize to all the

12    limited partners of MSMB.  I am terrible sorry I lost your

13    trust.  They deserve far better.  I know some of you

14    privately and publicly support me.  Despite that you should

15    know that I did not act appropriately or even close to a

16    reasonable standard that I could be proud of.

17          I want the people who came here today to support

18    me to understand one thing:  The only person to blame for me

19    being here today, is me.  It's not the Government.  There is

20    no conspiracy to take down Martin Shkreli.  I took down

21    Martin Shkreli with my disgraceful and shameful actions.

22    The Court is not to blame, the Court ruled very fairly, no

23    witness or attorneys, no piece of evidence, it's not the

24    conscientious jury, not the media.

25          Many of you who love me, support me, and look up

1   to me should reassess your position.  Do not feel bad for

2   me.  This is -- excuse me -- this is fault.  I am not a

3   victim here.  I'm the convicted defendant.  If I was more

4   transparent earlier and direct with my investors, I wouldn't

5   be here.

6           I wrote a long and extensive rebuttal and

7   apologies for the various gaps I've made over the years.  I

8   I'm not going to recite them.  I think Mr. Brafman did a

9   good job of articulating why exactly I behave the way I

10  behave.  I believe the prosecution has mischaracterized many

11  of the things I've done and some of the things in the

12  sentencing memorandum are, in fact, categorically and

13  unequivocally false.  Despite that, I'm not going to be

14  baited into going in the market and battling every single

15  point.  For instance, the IRA numbers, which are completely

16  wrong.  The PKAN characterization, which is unequivocally

17  incorrect and over examples that are too numerous to list.

18  It is not my job to do that.  The time for debate in

19  litigation is over.

20          The people who wrote letters supporting me know

21  the real me.  I know the real me.  I don't think

22  the Government knows the real me.  In fact, I don't think

23  the real me is a collage of characteristics and Orwellian

24  snippets collected over the years or even over the recent

25  period that display me in the worst light possible.  To take

Proceedings                                                    65

1    the worst, as Mr. Brafman said, of a person's correspondence

2    and claim that it's their whole, I think it's fundamentally

3    and intellectually wrong.

4            I move on to conclude here.  I want to close by

5    saying that as I look at the long road ahead for me, I want

6    to make sure that I get the tools to rehabilitate and

7    succeed.  The psychology in part is a stunning revelation to

8    me.  I am receptive to happy because I don't want to let

9    anyone down again.  My father told me once that there is a

10   silver lining in everything.  After feeling the

11   disappointment in adolescence -- or after feeling like a

12   adolescence, just a little bit of engagement after a life of

13   abuse was energizing for me.  But I got carried away and

14   lost much of my compass.  I wanted to be a success in the

15   business world while being very young and immature.  There

16   is still so much more I can do, and I will do it, the right

17   way.

18           Part of doing this the right way is surrounding

19   yourself with good people.  Mr. Brafman has been an

20   unexpected and extraordinary blessing in my life, not just

21   because of his effective advocacy, but because he believes

22   in me.  He advises me and mentors me.  As I improve my

23   intuition for business and business ethics, I can lean on

24   him for help.  He knows my corporate attorneys and my tax

25   attorneys that I've worked with and he has helped me to

Proceedings                                         66

1    build a good network of advisors that will guide me to

2    better days.  I owe it to him to not let him down.  I will

3    never make him regret the effort he has undertaken on my

4    behalf.

5              Prison has been a life-changing experience.  I'm

6    not going to complaint about life in jail.  The hardest part

7    is really seeing this sad world around you.  There's a very

8    sad world around me for the first time.  I took comfort in a

9    suicidal inmate who has several felonies and incarcerated

10   life as in showing a man who didn't attend high school that

11   they can go from accounting to calculus if they work hard

12   enough and have a teacher they can trust.  This has been a

13   life-changing experience for me.  And having the ability to

14   help these inmates is a silver lining.  Because of the

15   support letters, Your Honor knows I love to teach and help

16   people in need.  I have a calling that energized me far

17   greater than any Internet or antic scam.  These inmates know

18   me.  They like me and trust me.  I speak their language.  I

19   grow up in similar conditions in many cases and they can

20   identify with me.  With Your Honor's mercy, I pray that I

21   have a chance to be released soon, to begin community

22   service with the group of people after they are released

23   from prison.  I don't see this as a quota of hours to be

24   met, but like my own line educational work, a helpful and

25   healthy lifelong passion, a unique gap that I can fulfill

Proceedings                                                    67

1    people lives and contribute to with my business successes.

2    Please give me a chance to show what I am capable of.

3              Thank you.

4              THE COURT:  Thank you.

5              Mr. Brafman, did you want to be heard further,

6    sir.

7              MR. BRAFMAN:  No, Your Honor.

8              THE COURT:  Does the Government?

9              MS. KASULIS:  No, Your Honor.

10             THE COURT:  All right.  Thank you.

11             I note that Mr. Shkreli has acknowledged the

12   presence of his friends and family members.  I am aware that

13   that his father came every day to court.  I also know that

14   there was some difficult family circumstances in

15   Mr. Shkreli's childhood.  I have read all of the letters

16   written by Mr. Shkreli's friends, supporters, and family

17   members, and I will assure you that I am grateful for those

18   letters.  They give me a more wholistic view of who

19   Mr. Shkreli is beyond the charges for which he stands

20   convicted.  I have also read the letters that were

21   unsolicited, some of which were supportive of Mr. Shkreli

22   and others which asked for punishment for reasons that are

23   beyond the scope of this case.  In any event, I will share

24   Mr. Brafman's problems with insomnia.  This is not an easy

25   decision by any means.

Proceedings                                68

1          I would like to review the presentence report and

2     its calculations under the advisory guidelines.  The PSR

3     calculated Mr. Shkreli's advisory guideline total adjusted

4     offense level at 41, his criminal history was 1, and the

5     corresponding guideline range of imprisonment was between

6     324 and 405 months.  The PSR noted that the maximum

7     statutory sentence is 20 years for each of Counts 3 and 6,

8     and 5 years for Count 8.  The maximum total statutory

9     sentence is 45 years if the sentence were to run

10    consecutively.

11         Mr. Shkreli has made numerous suggestions to the

12    PSR, which I will address in a moment.  He has right to

13    understand what my rulings are regarding his objections to

14    the extent the probation department has not accepted those

15    objections.

16         First with regard to the loss enhancement, he

17    objects to PSR's use of the 20 level enhancement level for

18    the loss amount.  For the reasons stated in my February 26,

19    2018 memorandum and order, I will apply a loss amount of

20    $2,998,000 on Count 3; $3,402,450 on Count 6; and $4 million

21    on Count 8.  This results in a total loss amount of

22    $10,400,450 and a 20 level enhancement under the advisory

23    guideline.

24         Further, Mr. Shkreli objects to the PSR's

25    application of the 2 level enhancement for a sentence

Proceedings                                          69

1   involving more than ten victims.  I conclude that

2   enhancement of 2 levels for ten or more victims is

3   appropriate for two reasons:  First, as I discussed in the

4   February 26, 2018 memorandum and order at Pages 85 through

5   88, Mr. Shkreli's victims include the MSMB Capital and

6   MSMB Health Care investors who sustained actual loses due to

7   Mr. Shkreli's misrepresentations and omissions.  There were

8   seven MSMB Capital and 12 MSMB Health Care investors who are

9   victims of the offense of conviction in Counts 3 and 6;

10  thus, there 19 victims and a 2-point enhancement applies.

11          Furthermore, Mr. Shkreli avoided paying back these

12  investors, all of whom are repeatedly lied to by Mr. Shkreli

13  about their investments until the SEC had been alerted to

14  his scheme and several of his investors had threaten legal

15  action and public exposure of his scheme.  In the interim,

16  theses investor did not have use of their funds resulting in

17  significant costs, including attorneys' fee, in some

18  instances, and loss of time.  One investor, a recent

19  graduate, had invested one-third of her net worth into

20  Mr. Shkreli's MSMB Capital hedge fund based on Mr. Shkreli's

21  falsehoods.

22          Another investor estimates that he spent $56,000

23  in legal fees to recover his funds from Mr. Shkreli and

24  points out that his investment returns are due in part to

25  his own investing decision and Retrophin success after

Proceedings                           70

1   Mr. Shkreli left the company.  Another investor notes that

2   there were significant shortfall between what he was

3   promised and what he was given by Mr. Shkreli in terms in

4   the interest in Retrophin.

5             Second, Mr. Shkreli objections to enhancement is

6   based on the false premise that the MSMB investors were not

7   victims because Mr. Shkreli later used Retrophin assets to

8   pay them back.  Although I have decided in my discretion not

9   to include the lost amount enhancement attributable to

10  Count 7, of which Mr. Shkreli was acquitted, I will also not

11  credit Mr. Shkreli for misappropriating Retrophin assets to

12  repay MSMB investors.  Mr. Shkreli argument that these 19

13  investors were not victims is specifically rejected.

14            Next, the presentence report applies a two point

15  sophisticated needs enhancement pursuant to Sentencing

16  Guideline Section 2B1.1(B)(10)(C).  Mr. Shkreli argues that

17  the PSR based the application of this enhancement on conduct

18  charged in Count 7 of which he was acquitted.  I conclude

19  that based on the count of conviction, the application of

20  the sophisticated means enhancement is appropriate separate

21  and apart from conduct charged in Count 7.  The sentencing

22  guideline defines sophisticated means as especially complex

23  or especially intricate offense conduct pertaining to the

24  execution or concealment of an event.  That's Guideline

25  2B1.1.(B)(10), Comment Note 9(B).

Proceedings                                    71

1          Among other acts, Mr. Shkreli used investments

2     into MSMB Health Care to funnel money into Retrophin but

3     then withdrew $200,000 of that money to satisfy an

4     MSMB Capital investor.  Months later, he fraudulently

5     recharacterized $900,000 of the MSMB Health Care investment

6     as a loan to Retrophin enabling him to cause Retrophin to

7     transfer funds to MSMB Health Care.  He then used

8     MSMB Health Care's money to pay a $900,000 personal debt

9     that Mr. Shkreli owed to Merrill Lynch, because of a failed

10    trade at MSMB Capital.

11         With regard to Count 8, Mr. Shkreli, with the

12    knowledge and participation of his co-defendant, Mr. Evan

13    Greebel, arranged for Retrophin to undergo reverse merger

14    with Desert Gateway in part to permit Mr. Shkreli to acquire

15    control over more than 2 million free traded shares referred

16    to at trial as the Fearnow share.  They then attempted to

17    control those shares through a series of complex

18    transactions in which the shares were purchased at nominal

19    cost and distributed to a select group of individuals

20    referred to as the Fearnow shareholders.  The shares were

21    then transferred at Mr. Shkreli and Mr. Greebel's discretion

22    from the Fearnow shareholders, disgruntled MSMB investors,

23    and to Mr. Shkreli himself.  Mr. Shkreli and Mr. Greebel

24    carefully orchestrated the distribution of the Retrophin

25    shares to the Fearnow shareholders and the subsequent

Proceedings                                              72

1   transfer of those shares to the MSMB investors using

2   sophisticated means to avoid detection of the connection

3   between MSMB or Retrophin and the straw purchases.  These

4   complex transactions qualify as sophisticated means.

5            Next, the PSR applies a 4-point enhancement

6   pursuant to Sentencing Guideline Section 3B1.1(a) because

7   the probation department concluded that Mr. Shkreli was an

8   organizer or leader of criminal activity that involved five

9   or more participants or was otherwise extensive.

10  Mr. Shkreli argues that the PSR relied incorrect information

11  regarding the circumstances and conduct in Count 8 to

12  establish a leadership role enhancement.  I conclude that

13  the leader and organizer role in the offense enhancement is

14  appropriate in this case.

15           As discussed in the February 26, 2018 memorandum

16  and order, Mr. Shkreli, along with Mr. Greebel, organized

17  the distribution and manipulation of the Fearnow shares.

18  Trial evidence showed that Merek Biestek, Kevin Mulleady,

19  Thomas Fernandez, Ron Tilles, Andrew Vaino, and Edmund

20  Sullivan participated in Mr. Shkreli Mr. Greebel's scheme to

21  control the Fearnow shares.

22           The PSR also applied a 2-point enhancement for

23  obstruction of justice pursuant to Sentencing Guideline

24  3C1.1.  The PSR references Mr. Shkreli's statements in

25  response to an SEC *subpoena* that, among other things, quote,

Proceedings                                    73

1    "MSMB Capital was still active and had $2.6 million in

2    assets under management."  Mr. Shkreli argued that he

3    complied in every respect with the SEC's investigation and

4    that the obstruction of justice enhancement should not

5    apply.  The Government has also noted that Mr. Shkreli made

6    over misrepresentations to the SEC in the course of the

7    SEC's investigation, specifically, in Mr. Shkreli's

8    testimony to the SEC in August 2013 and February 2014.

9    The Government relies in part on exhibits not introduced

10   into evidence at trial.  Although, I agree with

11   the Government that Mr. Shkreli lied to the SEC, I conclude

12   that an enhancement for obstruction of justice is not

13   appropriate in this case on the facts presented to the

14   Court.  The relevant Sentencing Guideline Section 3C1.1

15   applies, quote, "if one, the defendant willfully obstructed

16   or impeded or attempted to obstruct or impede the

17   administration of justice with respect to the investigation

18   of the instant offense of conviction, and two, the

19   obstructive conduct related to the defendant's offense of

20   conviction and any relevant conduct or closely related

21   offense."

22          The guidelines also explain the "obstructive

23   conduct that occurred prior to the start of the

24   investigation of the instant offense may be covered if the

25   conduct was purposely calculated and likely to thwart the

1    investigation or prosecution of the offense of conviction."

2    That is Guideline 3C1.1, Comment Note 1.

3            The record before this Court does not reveal the

4    relationship, if any, between the SEC's investigation

5    between 2012 and 2014 and the FBI's investigation and the

6    instant offenses of conviction.  It is not clear when the

7    FBI investigation that led to this prosecution formally

8    began.  Nor does the Court have a sufficient basis for

9    concluding that Mr. Shkreli's actions with regard to the SEC

10   were purposefully calculated or likely to thwart the

11   investigation of an instant offences of conviction;

12   therefore, the obstruction of justice enhancement will not

13   be applied when I calculate Mr. Shkreli's offense level.

14           Mr. Shkreli also makes numerous objections to

15   statements of facts in PSR.  First with regard to

16   Paragraph 5, he objected to the PSR's reference to

17   statements he made about journalists Lauren Duca and Anna

18   Kasperian with respect to the reasons he was remanded into

19   custody.  As I explained on the record when I remanded

20   Mr. Shkreli after a jury had found the defendant guilty, the

21   Court generally and presumptively shall remand or detain

22   defendant unless I find by clear and convincing evidence

23   that this defendant does not present a danger to the

24   community.  Notwithstanding the presumption in favor of

25   remand after Mr. Shkreli was found guilty of Counts 3, 6,

Proceedings                                    75

1    and 8, I initially permitted Mr. Shkreli to remain at

2    liberty.  During the remand proceeding, the Government

3    raised the issue of Mr. Shkreli's statement of his

4    intentions to engage in nonconsensual sex with Ms. Duca and

5    Ms. Kasulis.  However, I recognize the distinction between

6    Mr. Shkreli's own statements concerning his own conduct

7    regarding these reporters and his solicitations from his

8    many social media followers of violence against a public

9    figure in exchange for money.  I concluded then that

10   Mr. Shkreli had solicited violence against former Secretary

11   of State and First Lady Clinton, a public figure, and that

12   there was a heightened risk of violation against her given

13   his tens of thousands of social media followers and his

14   history of making offers to people to take auction in

15   exchange for money.

16          Indeed, the defendant submitted a letter from a

17   former Princeton student who attended a conference -- or a

18   lecture at which Mr. Shkreli offered payment of tuition in

19   exchange for a solution to a mathematical proof.  Although

20   Mr. Brafman argued in connection with his motion to

21   modify -- in connection with his argument against revocation

22   of his bail, that Mr. Shkreli made preposterous promises

23   that are never paid forward, the former student's letter

24   indicated that Mr. Shkreli did make payment once the

25   student's proof was validated.

Proceedings                                          76

1          Certainly, Mr. Shkreli's threats prompted the

2     Secret Service to investigate and enhance protection of

3     Ms. Clinton as she was prepared to engage with the public on

4     a book tour.  Although the Court was made aware in the

5     Government's motion to revoke bail of Mr. Shkreli's

6     escalating pattern of threats and harassment, including, but

7     not limited to unwelcome and offensive sexual threats that

8     he made about Ms. Duca and Ms. Kasperian, my decision to

9     remand Mr. Shkreli was based on my determination that

10    Mr. Shkreli's widely circulated solicitation of violence

11    against Former Secretary Clinton in exchange for $5,000 for

12    a strand of hair with follicles created a risk of danger to

13    her and the public, and that Mr. Shkreli could no longer

14    overcome a prosecution in favor of remand following a guilty

15    verdict.  Thus, Paragraph 5 accurately states that

16    Mr. Shkreli was remanded to custody on September 13th, 2017

17    after the Court found that he did not show by clear and

18    convincing evidence that he did not pose a danger to any

19    person and the community.

20          Next with regard to Paragraph 7, Mr. Shkreli

21    contends that the PSR erred in stating that Mr. Shkreli

22    serve as Retrophin Incorporated's CEO from approximately

23    December 2012 to through September 2014.  Mr. Shkreli's

24    proposed correction does not distinguish between Retrophin,

25    Inc., the public company, and Retrophin, LLC, the private

Proceedings                                    77

1    company, of which Mr. Shkreli was interim CEO.  The PSR is

2    accurate as it only references Mr. Shkreli's role as CEO of

3    Retrophin, Inc., the public company.

4          Mr. Shkreli next objects to Paragraph 8 reference

5    to a personal investment in MSMB Capital.  As the Government

6    points out, Mr. Shkreli did tell an MSMB Capital investor,

7    Lindsay Rosenwald, that as of September 2009 MSMB Capital

8    was 100 percent our money.  Mr. Shkreli also objects to the

9    PSR's reference to a failure to disclose his losses in

10   managing Elea Capital hedge fund.  Mr. Shkreli states that

11   Darren Blanton, one of his MSMB Capital investors was aware

12   of the judgment arising from the loss at Elea Capital.

13   Mr. Blanton, however, testified that he was not aware that

14   Elea Capital has lost all of its money.  Furthermore that

15   one of Mr. Shkreli's investor discovered through his own due

16   diligence rather than disclosure by Mr. Shkreli that there

17   was what he believed to be a trading misunderstanding

18   relating to Elea Capital, did not deter any material

19   omission by Mr. Shkreli regarding Elea Capital.

20         Next Mr. Shkreli objects to the PSR's statement at

21   Paragraph 12 that he concealed MSMB Capital's true

22   performance from his limited partners noting that he had

23   mentioned the Orex trade to Mr. Blanton.  As I have

24   previously discussed, however, Mr. Shkreli concealed the

25   total loss incurred as a result of the Orex trade from his

Proceedings                                78

1   MSMB Capital investors.  Although he made a partial

2   disclosure about the loss to Mr. Blanton, he continued to

3   send Mr. Blanton performance reports after the loss showing

4   positive returns leading Mr. Blanton to believe that

5   everything was okay.

6          And that was his testimony of February 26, I'm

7   sorry his testimony which was referenced in my February 26th

8   memorandum.

9          In Paragraph 14 of the PSR Mr. Shkreli takes issue

10  with a statement that on September 15, 2012, Mr. Shkreli and

11  Mr. Biestek admitted in the course of a settlement with

12  Merrill Lynch that MSMB Capital had zero in assets.

13  Mr. Shkreli states that the document in question accurately

14  specified that MSMB Capital had zero in cash and equivalent

15  and reiterates its claim that Retrophin was an asset of

16  MSMB Capital.  The Government responds that during the

17  settlement negotiation with Merrill Lynch, Mr. Shkreli

18  provided a schedule of the approximate value of his own and

19  MSMB Capital's assets, cash and equivalent.  Mr. Shkreli

20  represented that he had $1,415 in personal assets, cash and

21  equivalent and that MSMB Capital had zero.

22         The Government correctly asserts that taken as a

23  whole, Mr. Shkreli's disclosure to Merrill Lynch was a

24  representation and warranty that MSMB Capital had no assets,

25  cash or equivalent on September 5, 2012.

Proceedings                                      79

1           Next Mr. Shkreli disputes statements in

2    Paragraphs 15 and 19 in connection with Mr. Shkreli's

3    September 10, 2012, wind-down e-mail to MSMB Capital and

4    Healthcare investors.  The PSR notes that Mr. Shkreli

5    misrepresented the liquidity of both funds.  The Government

6    responds that Mr. Shkreli's objection states reargument of

7    evidence presented at trial.  Mr. Shkreli argues that his

8    wind-down e-mail reflected an error in judgment which cannot

9    be equated with intentional fraud but he was simply

10   optimistic that Retrophin would soon receive an infusion of

11   cash from Valiant Pharmaceuticals.  Mr. Shkreli's

12   representations in a wind-down e-mail are an example of the

13   pattern of lying to its investors about the performance and

14   liquidity of the funds.  Following the wind-down e-mail the

15   investors who requested cash redemption faced significant

16   difficulties in redeeming their investments.  Moreover,

17   Mr. Shkreli's optimism that Retrophin would receive a cash

18   infusion suggests that Mr. Shkreli was planning to take

19   money from Retrophin through its investors to repay

20   MSMB Capital and Healthcare investors but he provides no

21   explanation for how the transfer of anticipated funds from

22   Retrophin investors to MSMB Capital and MSMB Healthcare

23   investors could have been made in an illegitimate manner.

24   Suggestions to Paragraphs 15 and 19 are expressly denied.

25           Next Mr. Shkreli objects to Paragraph 16 of the

Proceedings                                    80

1   PSR and its reference to the misrepresentation and omissions

2   made to MSMB Healthcare investors whose did not testify at

3   trial.  As I have explained in multiple rulings the test for

4   materiality in the criminal securities fraud case is

5   subjective, not subjective.  In other words, what would a

6   reasonable investor find to be material to his or her

7   investment decision.

8            The evidence admitted at trial established that

9   Mr. Shkreli made material misrepresentations and omissions

10  to his investors in multiple performance reports.  The PSR's

11  inclusion of misrepresentations and omissions to the

12  nontestifying MSMB Healthcare investors was therefore

13  appropriate.

14           Mr. Shkreli also argues in objection to

15  Paragraph 17 that in describing material misrepresentations

16  to the potential MSMB Healthcare investors the PSR

17  improperly incorporates references and evidence related to

18  an overt act of the conspiracy charged in Count 4 for which

19  he was acquitted.  The Court respectfully disagrees.  The

20  PSR properly incorporates an admitted trial exhibit as an

21  example of Mr. Shkreli's misrepresentation to potential

22  investors, specifically an e-mail from Mr. Shkreli to Kevin

23  Mulleady in which Mr. Shkreli materially misrepresents the

24  value of MSMB Healthcare's active under management, knowing

25  and intending that Mr. Mulleady would use that inflated and,

1    in fact, false valuation for purposes of soliciting

2    investments in the funds.

3            Mr. Shkreli next objects to Paragraph 18 of the

4    PSR which states that Mr. Shkreli provided fabricated

5    information to NAB Consulting which acted for a period as

6    MSMB Healthcare's fund administrator.  Mr. Shkreli objects

7    that the information provided to NAB was not fabricated.  As

8    the trial evidence showed, however, Mr. Shkreli's

9    representations to NAB Consulting and others included

10   significant misrepresentations concerning the size and

11   performance of MSMB Healthcare's investment in Retrophin.

12           In my February 26, 2018 memorandum and order at

13   Page 64 and 65 I discuss the series of transactions

14   resulting in the retroactive restructurization of MSMB

15   Healthcare's 900,000-dollar investment in Retrophin.

16   Mr. Shkreli then makes a series of objections to

17   Paragraphs 21 through 35 in the PSR related to conduct

18   charged in Count 7 of which Mr. Shkreli was acquitted.

19           As discussed, the Court found that the Government

20   had proven by at least a preponderance of the evidence the

21   conduct charged in Count 7 and I am permitted to consider

22   this conduct in sentencing, nevertheless, in my discretion I

23   will not consider this conduct except as necessary to the

24   extent of its interrelation with counts of conviction and I

25   therefore need not address each of these objections

Proceedings                               82

1    individually.

2           Mr. Shkreli then objects to statements in

3    Paragraph 36 through 40 of the PSR with a general objection

4    referencing the Rule 29 motion to a judgment of acquittal on

5    Count 8.  I addressed in deciding Mr. Shkreli's Rule 21 --

6    Rule 29 argument in the February 26, 2018 order.

7           Mr. Shkreli also objects to Paragraphs 82 and 117.

8    The PSR has been updated to reflect these objections and now

9    I would ask whether any parties have any other objections or

10   corrections or statements.

11          MS. KASULIS:  No, Your Honor.

12          MR. BRAFMAN:  No, Your Honor, thank you.

13          THE COURT:  Mr. Shkreli has calculated his total

14   offense level at 11 and his criminal history category of 1

15   resulting in a guideline range of imprisonment between 8 and

16   14 months.  In light of the Court's decision on the loss

17   amount which effects his guideline calculation, Mr. Shkreli

18   had requested a sentence between 12 and 18 months

19   incarceration followed by Court mandated therapy and 2,000

20   hours of community service.

21          As we know, the Government has requested a

22   sentence of 180 months, which is significantly below the

23   guideline range.  The probation department has recommended a

24   sentence of 96 months for each of Count 3 and 6 and 60

25   months on Count 8, which all sentences to run concurrently.

Proceedings                                83

1        With regard to finding, I make the following

2   finding:  On August 4th, 2018, Mr. Shkreli was found guilty

3   by a jury verdict on Counts 3, 6 and 8 of an eight-count

4   indictment.

5        Count 3 of the indictment charged Mr. Shkreli with

6   securities fraud in relation to an entity known as

7   MSMB Capital in violation of Title 15 United States Code

8   Section 78JB.

9        Count 6 of the indictment charged Mr. Shkreli with

10  securities fraud in relation to an entity known as

11  MSMB Healthcare in violation of Title 15 United States Code

12  Section 78JB.

13       Count 8 of the indictment charged Mr. Shkreli

14  together with Evan Greebel and others with conspiracy to

15  commit securities fraud in relation to an entity known as

16  Retrophin in violation of Title 18 United States Code

17  Section 371.

18       The PSI calculated a base offense level of seven

19  and an add -- and then added a 20-level enhancement for loss

20  greater than 9.5 million and less than $25 million.  In

21  addition, the PSR added the enhancement that I discussed

22  earlier for obstruction of justice which resulted in a total

23  offense level of 41.

24       Upon special consideration of the advisory

25  guideline, I have independently computed Mr. Shkreli's

Proceedings                                   84

1    offense level and adjustments as follows:  Under guideline

2    Section 3B1.2 I first grouped the three counts of conviction

3    for sentencing purposes because the offense level for each

4    count is determined largely on the basis of the total amount

5    of loss.  That is Guideline 3B1.2.  This guideline also

6    specifically instructs the defenses under Section 2B1.1R23.

7    Both Counts 3 and 6 carry a statutory maximum sentence of 20

8    years under 15 U.S. Code Section 78SF.

9           Count 8 carries a maximum sentence of five years

10   under 18 U.S. Code Section 371.  Under Sentencing

11   Guideline 2B1.1A1 Mr. Shkreli's base offense level is seven.

12          For the reasons I have already discussed in

13   addressing Mr. Shkreli's objections to the PSR, the

14   enhancement I will apply are as follows:  Under

15   Guideline 3B1.3B I apply the offense level corresponding to

16   the aggregated quantity of loss, which as I have previously

17   explained is $10,400,450.  Under Guideline 2B1.1B1K, loss

18   amount of between 9.5 million and 10.5 million increase the

19   offense level by 20.

20          Under the sentencing Guideline 2B1.1B2A1 the

21   enhancement for 10 or more victims which result in an

22   increase of two points.

23          Under Guideline 2B1.1B10, the use of sophisticated

24   means results in an enhancement of the two points.

25          Under Guideline 3B1.1(a) because Mr. Shkreli's

Proceedings                                85

1   role as a leader of the conspiracy charged in Count 8 which

2   included more than five members, the offense level is

3   increased by four points.

4           With regard to the investment advisor enhancement,

5   Mr. Shkreli did not object to the PSR's application of

6   investment advisor enhancement.  I conclude that the trial

7   evidence clearly showed that at the time of the offense

8   conduct charged in Counts 3 and 6, Mr. Shkreli was an

9   investment advisor.  In addition the same enhancement

10  applies to officers and directors of publicly-traded

11  companies in connection with offenses involving the

12  violation of security fraud, thus the same enhancement could

13  also apply to Count 8 because Mr. Shkreli served as the CEO

14  of Retrophin, Inc., beginning in December of 2012 and served

15  in that role at the time of the offense conduct charged in

16  Count 8.

17          Under guideline Section 2B1.1B19A3, the offense

18  level is therefore increased by four points.

19          And as previously noted, I will not apply the

20  obstruction of justice enhancement.

21          Those enhancement and base offense levels result

22  in a total adjusted offense level of 39.

23          The PSR reported that Mr. Shkreli has no prior

24  criminal history and accordingly under the same table of the

25  advisory guideline, I find that Mr. Shkreli has a criminal

Proceedings                          86

1   history category of one.

2          Have I overlooked anything regarding the guideline

3   calculation, Counsel.

4          MS. KASULIS:  No, Your Honor.

5          MR. BRAFMAN:  No, Your Honor.

6          THE COURT:  Now, with regard to the sentencing

7   options, on Counts 3 and 6 the maximum statutory term of

8   imprisonment is 20 years on each count.

9          On Count 8 the maximum term of imprisonment is

10  five years.

11         None of the counts of conviction are required to

12  run consecutively.

13         Under the guideline, the range of sentence for a

14  total offense level of 39 and a criminal history category of

15  one is between 262 and 327 months.

16         For each of Count 3, 6 and 8, the Court may impose

17  a term of supervised release of three years.  Under 18 U.S.

18  Code Section 3583B2 multiple terms of supervised release

19  should run concurrently under Section 3624E of Title 18.

20         Under 18 U.S. Code Section 3559, Count 3 and 6 are

21  Class B felony and Count 8 is a Class B felony.  Under

22  Sentencing Guideline 5B1.2 the guideline range for

23  supervised release for each count is least one year but not

24  more than three years.

25         Under Title 18 U.S. Code Section 3561, Mr. Shkreli

Proceedings                    87

1   is eligible for probation of at least one but not more than

2   five years on each of Counts 3, 6 and 8.  That's

3   Section 3561 of Title 18.  The term of probation must run

4   concurrently under Section 3564.

5           Under the guidelines, Mr. Shkreli is ineligible

6   for probation because the applicable sentencing guideline

7   range is in Zone B of the sentencing table,

8   Guideline 5B1.1A.

9           Although, as I have noted, we received today a

10  request for restitution from one of Mr. Shkreli's victims,

11  we will set that issue aside pending further submissions

12  from the parties.

13          On Counts 3 and 6 with regard to a fine, the

14  maximum fine is $5 million under 18 U.S. Code Section 78FS.

15  On Count 8 the maximum statutory fine is $250,000 under 18

16  U.S. Code Section 3571B.  Under Guideline 5E1.2C3 and 4 and

17  5E1.2 H, the applicable range of fine for Mr. Shkreli is

18  between $25,000 to $10 million.  I would note that

19  Mr. Shkreli argues that he does not have assets to pay a

20  fine, however I believe that the record reflects otherwise.

21          In addition, Title 18 U.S. Code Section 3013

22  requires that I impose a $100 mandatory special assessment

23  on each count of conviction and therefore he will have to

24  pay a 300-dollar mandatory assessment.

25          In addition to the above penalties on March 5,

Proceedings                                          88

1   2018, I so ordered the Government to preliminary order of

2   forfeiture which will be incorporated into the judgment.

3   The order authorized the forfeiture of substitute assets up

4   to the amount of $7,360,450.  Specifically a $5 million

5   brokerage account currently held at E-Trade ending in digits

6   0258.  That account was used to secure Mr. Shkreli's bail

7   and was held for purposes of the sentencing after he was

8   remanded.

9         Mr. Shkreli's interest in Vyera Pharmaceuticals,

10  formerly known as Turing Pharmaceuticals; the album, "Once

11  Upon a Time in Shaolin" by the Wu Tang Clan; the album, "Tha

12  Carter 5" by Lil' Wayne, a Picasso painting.

13        At this time I advise Mr. Shkreli that you do have

14  the right to appeal you sentence.  Any appeal must be filed

15  within 14 days of judgment being entered in this case.  If

16  you cannot afford to pay the cost of filing an appeal, you

17  may apply for leave to do so without paying the filing fee

18  if you can establish that you are indigent.  If you request

19  the clerk of this court to do so, we will prepare and file

20  under a notice of appeal on your behalf, and I understand

21  that defense counsel will take all necessary steps to

22  protect Mr. Shkreli's right to appeal and to have counsel on

23  appeal.

24        MR. BRAFMAN:  That's correct, Your Honor.

25        THE COURT:  Thank you.

Proceedings                                89

1          Has the Government arranged for return of any of

2     Mr. Shkreli's property that may have been retained at the

3     time of his arrest to avoid any unnecessary proceedings.

4          MS. KASULIS:  Your Honor, I don't believe we have

5     any of those items, but for the sake that we do, we

6     certainly will return them.

7          THE COURT:  Does Mr. Shkreli, Mr. Brafman, care to

8     identify any items that the FBI or the Government may be

9     holding?

10         MR. BRAFMAN:  Just the passport, Your Honor.

11         THE COURT:  All right.

12         MR. BRAFMAN:  Just the passport.

13         THE COURT:  The passport is being held by the

14    Court by pretrial, I believe, at the time and it will be

15    held until he finishes his entire sentence including

16    supervised release.

17         Are there any other matters that either

18    Mr. Shkreli or the Government wish to bring to my attention?

19         MS. KASULIS:  No, Your Honor.

20         MR. BRAFMAN:  No, Your Honor.

21         THE COURT:  All right.  As we know the guidelines

22    are no longer mandatory and I have the authority to depart

23    from the guideline.  As I noted before, I find that

24    Mr. Shkreli's total adjusted offense level under the

25    guideline is 39, his criminal history category is one and

1    his guideline range of imprisonment would be between 252 and

2    327 months.

3          Under Title 18 U.S. Code Section 3661, there is,

4    quote, no limitation on the information concerning the

5    background, character and conduct that I may receive and

6    consider for purposes of imposing the appropriate sentence.

7    Nevertheless, because I know that this case has attracted

8    significant attention from the press and from the public, I

9    want to reiterate something that I had stated from the

10   beginning of Mr. Shkreli's trial.  This case is not about

11   Mr. Shkreli's self-complicated public persona nor his

12   controversial statements about politics or culture, nor is

13   this case about Mr. Shkreli's actions or statements

14   regarding pharmaceutical pricing.  As we note, the pricing

15   of pharmaceuticals and any limitations upon it is not before

16   me, that is the job of the United States Congress.  For that

17   reason, I will base my sentence on the conduct which

18   Mr. Shkreli has been found guilty; namely, two counts of

19   securities fraud and one count of conspiracy to commit

20   securities fraud.

21         In determining Mr. Shkreli's sentence I have

22   reviewed all of the facts contained in the PSR and its

23   addenda.  And I have given special consideration to the

24   advisory guideline and the factors set forth in Title 18

25   U.S. Code Section 3553(a).  I've also taken great care in

Proceedings                                    91

1    reviewing all of the submissions by the parties and the

2    attachments of friends, family, supporters and detractors.

3    I've also reviewed the numerous sentencing letters that were

4    sent unsolicited to the Court.  I've considered the nature

5    and circumstances of Mr. Shkreli's offense and I find them

6    to be extremely serious.  Mr. Shkreli was convicted of two

7    counts of securities fraud and one count of conspiracy to

8    commit securities fraud.

9           Starting in 2009, Mr. Shkreli defrauded investors

10   in an MSMB Capital hedge fund.  He's written to individuals

11   with whom he had cultivated a relationship and set down to

12   meals with these individuals, he had met them face-to-face,

13   yet he made multiple misrepresentations and omissions of

14   material fact.  Mr. Shkreli lied about the size of the fund,

15   the nature of the funds, investing approach and strategy,

16   his personal investing experience and his educational

17   background, and the extent of the third-party oversight by

18   auditors and lawyers over the fund's operation.  Mr. Shkreli

19   induced investments and induced investors to keep their

20   money in the MSMB Capital fund by circulates periodic

21   performance reports to investors that materially misstated

22   the value of their investments and the fund's performance.

23          After Mr. Shkreli lost all of the MSMB Capital

24   fund's money in a failed investment in February 2011 he

25   chose to begin a new fund, MSMB Healthcare.  Just as with

Proceedings                                    92

1   MSMB Capital he solicited investments based on lies about

2   the size and nature of the fund and his experience.  He also

3   mislead MSMB Healthcare investors about the performance of

4   their investment.

5              In February 2011 Mr. Shkreli, again, working to

6   create Retrophin, a pharmaceutical company, unbeknownst to

7   MSMB Healthcare investors, Mr. Shkreli use significant

8   amounts of the money invested in MSMB Healthcare to fund

9   Retrophin.  And this is important because the fund was

10  described as a diversified fund, a fund that would be liquid

11  and that would take long and short positions.  Mr. Shkreli

12  redirected over a $1 million from MSMB Healthcare into

13  Retrophin and then used those funds to pay off unrelated

14  professional and personal obligations.

15             In September 2012 Mr. Shkreli told his MSMB

16  investors that it was winding down both hedge funds to focus

17  on Retrophin.  He falsely represented to those investors

18  that they could redeem their investments in cash by a date

19  certain, specifically stating in the wind-down letter that

20  investors could be cashed out by October 31st of 2012.  When

21  investors in the MSMB Healthcare and Capital funds became

22  suspicious about Mr. Shkreli's failure to redeem their

23  funds, Mr. Shkreli strung them along by ultimately ignoring

24  them, pretending to work on paying them back or delaying

25  their redemptions for months or years.

Proceedings                                    93

1          In the fall and early winter of 2012 Mr. Shkreli

2    worked with Mr. Greebel and others to take Retrophin public

3    through what is known as a reverse merger transaction with a

4    shell company Desert Gateway.  Although there's nothing

5    illegal about a reverse merger itself, Mr. Shkreli explained

6    his choice with Desert Gateway to his coconspirator Evan

7    Greebel for although Desert Gateway was more expensive than

8    the other reverse merger option, Mr. Shkreli and Mr. Greebel

9    conspired to ensure that 2 million of the $2.5 million free

10   trading shares would be purchased for nominal amounts by

11   select group of Mr. Shkreli's employees and friends.

12          (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                    94

1        THE COURT:  (Continued)   Mr. Shkreli and

2   Mr. Greebel then agreed to use the Fearnow shares for

3   Mr. Shkreli's purposes, even though the shares were nominally

4   owned by others.  First, Mr. Shkreli and Mr. Greebel tried to

5   control the sales of the Fearnow shares with the intent of

6   preventing the share price of Retrophin from falling.  When

7   one Fearnow shareholder, Timothy Pierotti, began to sell his

8   shares against Mr. Shkreli's instructions, Mr. Shkreli tried

9   to stop him and made serious threats directed at Mr. Pierotti

10  and his family.  Mr. Shkreli wrote a letter that threatened

11  action directly to Mr. Pierotti's wife, which disparaged

12  Mr. Pierotti and threatened to make the Pierotti family,

13  including their four young children, homeless.

14        He also froze Mr. Pierotti's brokerage account, and

15  according to the Government hacked into the family's social

16  media accounts, including those of Mr. Pierotti's minor

17  children.  He later boasted in an interview about what he had

18  done, stating:  "I threatened that dude and his fucking kids"

19  and repeated, "I threatened that fucking guy and his fucking

20  kids because he fucking took $3 million from me and he ended

21  up paying me back....  I had two guys parked outside his house

22  for six months watching his every fucking move.  I can get

23  them."

24        Second, Mr. Shkreli and Mr. Greebel used the Fearnow

25  shares for Mr. Shkreli's benefit.  Mr. Shkreli and Mr. Greebel

Proceedings                                                   95

1    caused some of the Fearnow shares to be transferred to

2    individuals to whom Mr. Shkreli owed money because of

3    misrepresentations he had made in connection with their

4    investments in the MSMB entities or Retrophin.

5           Eventually, once Retrophin secured additional

6    investments through PIPEs in January and February of 2013,

7    Mr. Shkreli used Retrophin's money to pay off his MSMB

8    investors through what the Government alleged was fraudulent

9    settlement and consulting agreements, charged in Count Seven.

10   As I have explained, although I will not take the fraudulent

11   conduct charge in Count Seven into account in my sentencing

12   determination, I will also not give Mr. Shkreli any credit for

13   funneling Retrophin's money and shares to his defrauded

14   investors.

15          Second, I have considered Mr. Shkreli's personal

16   history characteristics and circumstances.

17          He was born March 17, 1983, in Brooklyn.  His

18   parents, Pashko and Katrina, who immigrated from Albania are

19   ages 60 and 55 and are in good health.  Pashko Shkreli is a

20   retired manager at a private sanitation company, and Katrina

21   Shkreli is employed at a private sanitation company.  The

22   family lived in the lower-middle income circumstances in

23   Brooklyn.

24          Mr. Shkreli has two sisters and a brother.  His

25   sister, Leonora Izerne, is 36 years old and married and

Proceedings                              96

1   resides in Queens, New York.  She's in good health and

2   Mr. Shkreli maintains a close relationship with her.  Mark

3   Shkreli, Mr. Shkreli's younger brother, also lives in

4   Brooklyn.  He is supported financially by Mr. Shkreli and is

5   very close to his brother.  He has written a very moving

6   letter about needing and assistance that Mr. Shkreli gives

7   him.

8            Mr. Shkreli's youngest sister, Anna Shkreli, is 19

9   and attends college in Brooklyn.  He has a good relationship

10  with her.

11           Mr. Shkreli has described his childhood as lonely

12  and difficult, and his family dynamic is tumultuous.

13  Mr. Shkreli reports having a poor relationship with his

14  parents because of abuse that he suffered.  He reports that

15  his parents were physically and verbally abusive to him and

16  Leonora, and that his father was physically abusive to his

17  mother on a regular basis.  His parents also did not permit

18  Mr. Shkreli and his sisters to interact with their peers.

19  Mr. Shkreli rebelled against his parents sometimes physically.

20  Mr. Shkreli now has limited contact with his parents and

21  reports seeing them once or twice a year.  Mr. Shkreli's

22  sister, Leonora Izerne, corroborates Mr. Shkreli's description

23  of their childhood experience stating that Mr. Shkreli's

24  father was physically and emotionally abusive towards the

25  siblings and the mother.  She writes, "It is only now as an

1   adult that I can comprehend how terrible it all was."

2   Ms. Izerne recalled that Mr. Shkreli has tutored her in math,

3   bought her first cell phone and employed her at his companies,

4   and she describes Mr. Shkreli as a wonderful brother.

5              At a young age, Mr. Shkreli reports that his

6   teachers deemed him a prodigy.  He stated that his parents

7   understood his abilities but sometimes shut down opportunities

8   presented to him.  Mr. Shkreli was accepted into the elite

9   Hunter College High School from September 1995 through

10  February 2000, but he left in tenth grade because he was not

11  taking school seriously.  He was also informed that he would

12  not be passed forward to eleventh grade and would have to

13  repeat tenth grade.  He stated that he had terrible grades and

14  dropped out as a form of rebelling against his parents.

15  Mr. Shkreli's high school friend, Frankie Guttman, who later

16  worked with Mr. Shkreli at Elea Capital Management writes that

17  Mr. Shkreli received little to no support from his parents and

18  would show up to school without any money for lunch needing to

19  borrow money so he could eat.  Mr. Guttman and another high

20  school friend, David Zheng, recalled that Mr. Shkreli took

21  care of his siblings.  Mr. Zheng wrote that Mr. Shkreli made

22  diligent efforts to support and nurture his sisters and

23  brother both financially and emotionally.

24             After leaving Hunter College High School,

25  Mr. Shkreli attended and graduated from City-as-a-School, an

Proceedings                                    98

1   alternative high school.  He attended Baruch College from 2001

2   to 2004, graduating with a Bachelor's of Business

3   Administration in 2004.  In approximately 2003, Mr. Shkreli

4   left his parents' home to live in Manhattan, and prior to

5   doing that, he lived alone in an apartment in Manhattan in an

6   upper-income neighborhood.

7            From April 2000 to April 2004, Mr. Shkreli worked as

8   an intern, then an associate at the hedge fund Cramer

9   Berkowitz, earning $50,000 annually.

10           From April 2004 to December 2004, Mr. Shkreli worked

11  at UBS Wealth Management as an associate earning $50,000 a

12  year.  He left UBS to work as a hedge fund analyst at Intrepid

13  Capital Funds earning $75,000.  Mr. Shkreli left Intrepid

14  Capital in January 2006 to start Elea Capital, a hedge fund.

15  His high school friend, Mr. Guttman, recalls that Mr. Shkreli

16  realized that by teaching himself the complex science, he

17  could have a leg up on the competition.  Mr. Shkreli worked

18  nonstop and expected the same of his employees.  After Elea

19  Capital failed in July of 2007, Mr. Shkreli moved in with his

20  sister, Leonora, in Queens for a year and received some

21  financial assistance from her.  For several months in 2008,

22  Mr. Shkreli worked as a portfolio manager at Royal Bank of

23  Canada, but he was terminated in September 2008 for trading in

24  a manner that violated company policy.  As I have discussed,

25  he started MSMB Capital in September 2009 and MSMB Healthcare

Proceedings                                                99

1    in February 2011.  The PSR states that Mr. Shkreli started

2    Retrophin in late 2010, although trial evidence suggested that

3    the company started operations in the spring of 2011.

4    Retrophin became a public company in December 2012 and was

5    incorporated in New York on November 12th, 2013.  Mr. Shkreli

6    left Retrophin in the fall of 2015.

7             Mr. Shkreli began Turing Pharmaceuticals, now Vyera

8    Pharmaceuticals, in early 2015.  He reported investing $20

9    million in the company and was the CEO until he voluntarily

10   stepped down after his arrest on December 18th, 2015.

11   According to the current CEO, "Vyera is committed to

12   developing and commercializing treatments that address serious

13   and neglected diseases with high unmet needs."  Mr. Shkreli

14   held a 50 percent ownership interest in Vyera but did not take

15   a salary.  In November 2015, Mr. Shkreli became the CEO of

16   KaloBios Pharmaceuticals, a publicly-traded company.  He was

17   not compensated and invested between $2 million and $3 million

18   in the company.  He stepped down as CEO on December 17th,

19   2015, following his arrest.  In August 2016, Mr. Shkreli

20   started Godel Systems, Inc., a software company.  He invested

21   $500,000 in the company and did not receive a salary.  He left

22   Godel on September 18th, 2017, but a current employee has

23   stated that the company would consider reinstating Mr. Shkreli

24   upon his release.  In addition to this employment history, I

25   note that Mr. Shkreli has had personal success investing in

Proceedings                                    100

1    the stock market, reporting $20 million in net gains in 2015.

2    Along with three other individuals, Mr. Shkreli, is listed as

3    the owner of three US patents for treatment of neurological

4    disorders.

5            Mr. Shkreli has been incarcerated since

6    September 13th, 2017.  The PSR reports that he has had no

7    disciplinary incidents at MDC and Mr. Shkreli has become

8    involved in teaching and mentoring inmates.

9            The PSR also describes Mr. Shkreli's financial

10   status based on his tax returns from 2011 through 2015 and a

11   personal financial statement dated November 15th, 2017.  The

12   PSR notes that Mr. Shkreli did not file tax returns in New

13   York State between 2007 and 2010.  Based on these sources, the

14   PSR, as amended on February 1st, 2018, states that Mr. Shkreli

15   has assets of $38,910,624 and liabilities of $11,725,646

16   resulting in a net worth of $27,184,978.  I know that this net

17   worth calculation does not incorporate the amount that I have

18   ordered Mr. Shkreli to forfeit for his criminal conduct,

19   specifically $7,360,450.  Mr. Shkreli is currently engaged in

20   several ongoing stayed cases, including a case brought by the

21   SEC.

22           Mr. Shkreli does not have a current source of

23   income, but reports that there is, quote, "good possibility of

24   significant future income in the form of dividends that is

25   unpredictable in nature."  He reports monthly expenses of

Proceedings                                                101

1   $6,400 while incarcerated.  The PSR concludes that Mr. Shkreli

2   has the ability to pay a fine, and I agree with that

3   conclusion.

4            On March 7, 2018, after I granted the Government's

5   preliminary motion for forfeiture, Mr. Shkreli's counsel filed

6   a letter stating that Mr. Shkreli was unable to pay a fine.

7   However, based on my review of his assets and liabilities and

8   statements by Mr. Shkreli, I conclude that he can afford to

9   pay a fine.

10           With regard to Mr. Shkreli's mental and physical

11  condition, Mr. Shkreli does not have a history of serious

12  medical problems.  He takes Claritin for allergies and

13  demonstrates a history of panic attacks, which at one point

14  became so frequent that they negatively impacted his work.  He

15  takes medication for treatment of panic disorder and anxiety

16  disorder characterized by recurrent and unexpected panic

17  attacks.  He also has been prescribed other psychotropic

18  medications in the past.

19           Dr. David Salsberg, who examined Mr. Shkreli at

20  defense counsel's request, diagnosed Mr. Shkreli with

21  generalized anxiety disorder, major depressive disorder, and

22  an unspecified personality disorder.  Dr. Salsberg also noted,

23  however, that Mr. Shkreli has cognitive performance in a very

24  superior range and is extremely bright with intellectual

25  capacities at the highest levels, and that was brought out by

1    numerous tests that he conducted.

2          Mr. Shkreli has reported that he has made risky bets

3    with personal funds, including what the PSR refers to as

4    unreasonable risks, which have led to financial difficulties

5    including paying his rent.  Some of his investments have been

6    very successful and he has reported enjoying the thrill and

7    excitement of taking these risks.

8          In the past, Mr. Shkreli has used alcohol as an

9    outlet for stress, consuming up to seven or eight drinks on a

10   daily basis after his indictment in December 2015.

11   Mr. Shkreli has referred to his alcohol consumption as toxic

12   behavior.  Aside from a six-month period in 2008, Mr. Shkreli

13   does not report any history of illicit drug use.  Mr. Shkreli

14   is receptive to participating in mental health treatment, and

15   his sister also suggests that he may benefit from mental

16   health counseling.

17         I have considered the numerous letters written on

18   Mr. Shkreli's behalf, and, again, I am very grateful for time

19   that these individuals took to write to the Court or to

20   Mr. Brafman so that he could include those letters in his

21   submissions; that so many of Mr. Shkreli's family, friends,

22   and online acquaintances spent time and effort in writing

23   these letters speaks well of Mr. Shkreli.

24         Notwithstanding the difficult family dynamic,

25   Mr. Shkreli's father, Pashko, attended in the most devoted way

Proceedings                                      103

1    the trial nearly every day and he wrote a letter recounting

2    the pride of Mr. Shkreli's achievements as a child.  He

3    describes Mr. Shkreli's gift for math and science and early

4    passion for finance.  He recalls that Mr. Shkreli helped his

5    siblings with their homework.  He states that Mr. Shkreli is

6    his parents' pride and joy and their life.

7           In addition to describing Mr. Shkreli's difficult

8    childhood, Mr. Shkreli's sister, Leonora Izerne, describes

9    Mr. Shkreli's astounding comprehension and hunger to learn

10   calling her brother a walking encyclopedia who has impressed

11   doctors, scientists, senior executives, and experts despite

12   being self-taught.  Ms. Izerne describes something that we

13   have heard about at trial, that Mr. Shkreli's extraordinary

14   work ethic and passion for his work has garnered him a

15   successful reputation.  Mr. Shkreli's younger brother, Mark,

16   also describes Mr. Shkreli as an incredibly intelligent hard

17   worker who is also very giving and kind.

18          Many of these letters focus on the contrasts between

19   Mr. Shkreli's self-created public persona and his behavior

20   with individual friends, colleagues, and family.  These

21   letters are particularly valuable because they reveal a kind

22   and generous aspect of Mr. Shkreli's character, which is

23   likely unknown to the public, and Mr. Brafman has certainly

24   touched upon some of those letters.

25          On the other hand, I have received some letters from

Proceedings                                    104

1    individuals and organizations that describe the negative

2    impact of Mr. Shkreli's actions regarding pharmaceutical drug

3    pricing.  Most notably, I received a set of letters from

4    housing works and other charitable organizations that work

5    with individuals with HIV/AIDS in which they advocate for the

6    Government's proposed order of forfeiture in this case.

7            One letter, from Dr. Philip Bolduc of the University

8    of Massachusetts Medical School, states that due to

9    Mr. Shkreli's decision to sell the drug Daraprim for an

10   exorbitant price, the drug is not covered by some insurance

11   plans.  Mr. Bolduc writes that they lost a patient to septic

12   shock because of the unavailability of Daraprim due to what

13   Dr. Bolduc characterized as Mr. Shkreli's greed and mendacity.

14   Again, the drug pricing issue is not before for this Court,

15   notwithstanding the tragic consequences of pharmaceutical

16   price increases.  Again, that is Congress's job to do

17   something about this issue.

18           In contrast, Mr. Shkreli's friends and acquaintances

19   state, almost uniformly, that he is personally generous, kind,

20   and misunderstood, even though most recognize that some of the

21   misunderstandings stem from Mr. Shkreli's own actions.  Some

22   write about Mr. Shkreli's willingness to personally help

23   individuals in need from strangers with rare medical diseases

24   to his own employees.  One individual, who has a terminal

25   disease, wrote that she met Mr. Shkreli through an online

Proceedings                                          105

1   forum and that Mr. Shkreli was an invaluable resource for

2   individuals with rare diseases who often feel they are not

3   seen or heard by those in the pharmaceutical industry.

4   Similarly, when Mr. Shkreli was CEO for Retrophin, he took the

5   time to meet directly with a family whose children had been

6   diagnosed with a rare degenerative disease known as PKAN.

7   Mr. Shkreli and Retrophin offered their expertise and help,

8   including an offer of significant financial and medical aid.

9   The children's mother wrote that the Martin I know would go to

10  great lengths to make a difference in a person's life.  When

11  another individual, Robin Anderson, reached out to Mr. Shkreli

12  to seek his help and advice about a specific drug, Mr. Shkreli

13  took the time to research the drug and provide his insights on

14  how the family might be able to request approval for treatment

15  even though his own trial in this case was about to begin.

16          Mr. Shkreli's college friend, Jordan Walker, notes

17  that Mr. Shkreli once offered to pay for medical care for

18  Mr. Walker's girlfriend when she did not have insurance.  In

19  addition, as we know, an inmate at MDC told Mr. Shkreli that

20  his girlfriend had given birth to premature twins and

21  Mr. Shkreli arranged for the delivery of diapers, wipes, and

22  other items to the inmate's girlfriend, something the inmate

23  described as the most caring gesture anyone has ever done in

24  these stressful times.  Several of Mr. Shkreli's friends have

25  written about how Mr. Shkreli has supported them emotionally.

1  An individual writes that Mr. Shkreli offered her the truest

2  form of friendship she has ever known in a very difficult time

3  in her life.

4        Mr. Shkreli's supporters also described his

5  willingness to hire, work with, and mentor others from very

6  diverse backgrounds.  Tashdid Hasan met Mr. Shkreli while

7  driving a yellow cab to pay for his college education.

8  Mr. Shkreli encouraged Mr. Hasan to complete his degree and

9  educate himself on investing.  When Mr. Hasan met Mr. Shkreli

10  two years later, Mr. Shkreli hired Mr. Hasan as an intern at

11  Retrophin and later as an analyst at Turing.  Catherine Chen,

12  who worked at Retrophin, writes that Mr. Shkreli treated

13  everyone equally at the workplace like family and that she

14  witnessed many counts of kindness, consideration, and

15  thoughtful acts.  Similarly, Dr. Megan Roberts, a former

16  Retrophin and Turing employee writes that Mr. Shkreli was a

17  great boss who cared deeply for his employees.  Maureen Lohry,

18  Mr. Shkreli's employee and friend, described him as an

19  exceptional boss and a dedicated mentor who has continued to

20  mentor her through his incarceration despite his limited

21  access to means of communication.

22        Another letter mentioned earlier was from

23  Dr. Horacio Plotkin, and it stands out because at the trial,

24  we heard testimony from witnesses about Mr. Shkreli's

25  aggressive and belittling actions toward Dr. Plotkin who at

1   the time was Chief Medical Officer of Retrophin.  Dr. Plotkin

2   writes that Mr. Shkreli was a passionate individual whose

3   generosity is not known by many people but who possessed

4   remarkable scientific insight, such that he was able to think

5   out of the box and repurpose a drug that was developed for

6   hypertension for the treatment of a rare kidney disease.

7          Mr. Shkreli's employees describe him as inspiring

8   and gifted.  Many of the letters, whether from family, friends

9   or even Internet acquaintances, describe Mr. Shkreli's

10  intelligence and passion for science, particularly in the

11  field of rare diseases, and ask that I consider Mr. Shkreli's

12  potential to contribute to society in my sentencing.  It is

13  more than clear that Mr. Shkreli is a tremendously gifted and

14  intelligent individual who has a capacity for kindness.

15         Mr. Shkreli also has a career passion for teaching

16  and education.  I have received a number of letters from

17  individuals who have interacted with Mr. Shkreli on the

18  Internet who have simply watched his online video tutorials on

19  finance for chemistry.  Some of these individuals have also

20  met Mr. Shkreli in person.  They described their sincere

21  appreciation for Mr. Shkreli's efforts to share his knowledge

22  about finance and other topics and describe him as a gifted

23  teacher.  One individual notes that she was inspired to pursue

24  her goal of becoming a physician's assistant because of

25  Mr. Shkreli.  More recently, Mr. Shkreli has taught his fellow

1   inmates at MDC, one of whom writes that Mr. Shkreli is an

2   inspiring and patient teacher and has been the most positive

3   and influential part of his experience.

4           I have also considered Mr. Shkreli's charitable

5   donations.  Mr. Shkreli, both individually and through the

6   Shkreli Fund, has made significant donations to a variety of

7   causes.  He donated $1 million to Hunter College High School,

8   the largest gift in school history, and made contributions of

9   tens of thousand of dollars to charities and organizations

10  such as Charley's Fund, Matt's Promise, the University of

11  British Columbia, The New York Center for Children, and the

12  Lesbian, Gay, Bisexual & Transgender Community Center.

13  Notably, these donations occurred prior to Mr. Shkreli's

14  arrest for the instant offense.  Ms. Izerne, Mr. Shkreli's

15  sister, was personally involved in Mr. Shkreli's charitable

16  efforts, writing that Mr. Shkreli was genuinely eager to help

17  individuals and organizations, both through the Shkreli

18  Foundation and Mr. Shkreli's own private and personal efforts.

19  Mr. Shkreli's charitable contributions, efforts to help sick

20  individuals, and giving up his personal time are laudable.

21          The Government notes that Mr. Shkreli made some of

22  these contributions after defrauding his investors and that

23  these contributions are not distinctively different from other

24  white collar defendants.  Even though Mr. Shkreli's acts of

25  kindness and generosity may not entail an extraordinary

1   personal sacrifice as discussed by courts in the Circuit,

2   these acts provide the basis for a variance.

3          As I have already stated, this case is not about

4   pharmaceutical pricing or Mr. Shkreli's controversial

5   statements or actions, nor is it about Mr. Shkreli's

6   scientific aptitude.  But sentencing letters from both those

7   who ask for leniency and those who ask for a long sentence

8   have helped me understand Mr. Shkreli more fully.  I am

9   grateful for those who took time to write and to enlighten me

10  on Mr. Shkreli's whole person.  I have a better sense of who

11  he is.

12         Although he has been convicted of fraud, serious

13  crimes, and he opted for pecuniary gain, he's also a

14  personally generous, giving, and kind individual.  I am

15  persuaded that the downward departure or variance from the

16  sentencing guidelines is appropriate in this case.

17         In essence, however, this case is about his

18  egregious multitude of lies, his repeated breaches of trust in

19  people that he knew and looked at face-to-face, and his

20  conspiracy to manipulate the price and trading of a

21  publicly-traded security.  I therefore consider the need for

22  the sentence imposed to reflect the seriousness of the offense

23  to promote respect for the law and provide just punishment for

24  the offense to afford adequate deterrence and to protect the

25  public from further crimes by Mr. Shkreli.

Proceedings                                              110

1          In imposing a sentence that reflects the seriousness

2    of the offense, I am mindful that more than half of the total

3    offense level in this case is driven by the loss amount

4    calculation.  As then-District Judge Lynch, now Circuit Judge

5    Lynch wrote, "Loss is certainly a relevant sentencing factor:

6    All else being equal, large thefts damage society more than

7    small ones....  But the guideline provisions for ... fraud

8    place excessive weight on this single factor."  That was in

9    *United States v. Emmenegger*, 329 F. Supp 2d 416 at page 427,

10   and this was a 2004 decision.

11         Also, in the United *States v. Adelson*, 441 F. Supp

12   2d at 506, Judge Rakoff, in 2006, described the inordinate

13   emphasis that the guidelines place on the amount of loss in

14   fraud cases.  In part for this reason, the sentence I impose

15   will be significantly below the sentencing guideline range of

16   262 to 327 months.  I also note that both the Probation

17   Department and the Government have requested sentences below

18   the guideline range.

19         Mr. Shkreli's repeated lies to his investors and his

20   manipulation of Retrophin stock are precisely the types of

21   conduct that Congress sought to prohibit in enacting our

22   securities laws.  In imposing a sentence, I have therefore

23   considered the need to make clear, not just to Mr. Shkreli,

24   but also to other participants in our securities markets, that

25   fraud and manipulation are serious offenses that will incur

Proceedings                                                    111

1    correspondingly serious penalties.

2         My highly regarded colleague, Judge Jack B.

3    Weinstein, has observed that both individuals who engage in

4    financial fraud choose to engage in white collar crime because

5    they believe that the potential for significant financial

6    benefits outweighs the risk that they will be punished.  That

7    was in *United States v. Marsh,* 10-CR-0480, in a decision that

8    he wrote on October 26, 2011.

9         White collar offenders like Mr. Shkreli use their

10   intelligence and acumen to avoid detection of their crimes.

11   For example, Mr. Shkreli used his knowledge of the hedge fund

12   industry to create fraudulent performance reports which

13   deceived even the most sophisticated of investors into

14   believing that their investments were not only safe but were

15   performing at extraordinary levels.  Thrilled with

16   Mr. Shkreli's performance, these investors saw no reason to be

17   concerned about fraud and alert the authorities; indeed some

18   helped Mr. Shkreli convince others to invest in his MSMB

19   Healthcare Fund or the MSMB Capital Fund.

20        In sentencing Mr. Shkreli, I am mindful of the

21   Supreme Court's recognition that, quote, "deterrent effect

22   depends not only upon the amount of the penalty but upon its

23   certainty and that crimes that are less grave but

24   significantly more difficult to detect may warrant

25   substantially higher penalties."  That was their decision in

Proceedings                              112

1    *Harmelin v. Michigan*, 501 U.S. 957 at page 989 decided by the

2    Supreme Court in 1991.

3              I must also consider the need to deter Mr. Shkreli

4    specifically and to promote his respect for the law.  One

5    current Vyera employee writes that Mr. Shkreli has evolved

6    after his arrest and that Vyera operates with constant

7    vigilance for conflicts of interest and an attitude of extreme

8    conservatism toward all investors.  Mr. Shkreli has also

9    stated in his letter to me that he acknowledges and respects

10   the jury's verdict and that investors deserve truth and

11   transparency.  I also accept and believe that he is generally

12   remorseful for the betrayal of trust that his acts

13   demonstrated toward his investors.  He wrote that it breaks

14   his heart that good and honest people were dragged into this

15   mess because of him.  He also states that six months in a

16   maximum security prison has been a frightening wake-up call

17   and he knows he needs to change.

18             I must, however, view Mr. Shkreli's statements in

19   light of his other conduct and statements, some of which were

20   made since his conviction by the jury.  Mr. Shkreli has

21   clearly and repeatedly minimized his actions and the

22   significance of the jury's verdict.  In his letter to me, he

23   admits not to his multitude of lies, but only that he dodged

24   answering questions, he exaggerated if he felt that he had any

25   basis to make the claim, and he provided answers that were

Proceedings                                              113

1    only correct if put in a certain assumed context.  He

2    acknowledges that, quote, "These choices are now seen as

3    attempts to deceive and manipulate," end of quote.

4              To be clear, Mr. Shkreli's statements were not just

5    seen as attempts to deceive and manipulate.  They were actual

6    and intentional deceptions and manipulations of his individual

7    investors and public investors.  Mr. Shkreli told investors

8    that his hedge funds had tens of millions of dollars in assets

9    under management and were extraordinarily successful.  These

10   were lies.  None of what Mr. Shkreli characterizes as assumed

11   context, basis for exaggeration, or alternative

12   interpretations of facts would make them true.

13             Mr. Shkreli has also stated his expectation that,

14   quote, he will be released with time served or in the worst

15   case scenario get three to six more months of imprisonment.

16   In e-mails cited by the Government, Mr. Shkreli, in

17   January 2018, wrote "fuck the Feds" and claimed that the

18   Government would not be able to take all of his money.

19   Mr. Shkreli has also recently written, prior to my decision on

20   his Rule 29 motion, loss amounts, and forfeiture that the

21   prosecution, quote, "won three out of eight counts" and,

22   quote, "proved a fraud where no losses occurred ... it's a

23   reckless embarrassment, especially when Count Eight gets

24   dropped for Rule 29 ... and we appeal for the next ten years

25   on the remaining two counts."

Proceedings                          114

1          In another e-mail, Mr. Shkreli wrote that, quote, he

2     had a lot of remorse but then stated that, quote, he will do

3     everything and anything to get the lowest sentence possible

4     except to give up his constitutional rights.

5          And I recognize that certainly Mr. Shkreli has every

6     right to persist in his claim that he is innocent of the

7     charges and to appeal his conviction, but these e-mails call

8     into question the sincerity of his remorse in his letter to

9     the Court, particularly in light of Dr. Salsberg's report,

10    which states, among other things, that Mr. Shkreli, quote,

11    "employs maladaptive defenses such as denial and

12    rationalization" and that he, quote, "possesses a sense of

13    entitlement and a tendency to externalize responsibility."

14    Dr. Salsberg further notes that Mr. Shkreli may have illusions

15    of invincibility, preoccupation with thoughts of success, and

16    an undisciplined imagination that takes liberties with reality

17    at times, and that Mr. Shkreli constructs intricate

18    rationalizations.  Dr. Salsberg also notes the difficult

19    family circumstances and the toll that that took on

20    Mr. Shkreli.  He notes his exceptional intelligence and what

21    Dr. Salsberg believes is sincere remorse.

22          Based on Mr. Shkreli's actions and statements, the

23    Court cannot be confident that a minimal sentence of 12 to

24    18 months requested by the defense will deter Mr. Shkreli from

25    future crimes or protect the public.  The sentence I impose

Proceedings                                    115

1    must therefore reflect the need to promote respect for the law

2    and to deter Mr. Shkreli, specifically, from illegal conduct.

3    To avoid unwarranted sentencing disparities and unfair

4    sentences, I have also researched and reviewed sentences in

5    similar cases, both those before me personally and those in

6    this circuit.

7          After giving respectful consideration to the

8    advisory Sentencing Guidelines and related policy statements,

9    the request of the parties, and all of the factors set forth

10   in Title 18 U.S. Code Section 3553(a)(1)-(7) and for the

11   reasons stated, I will impose a sentence that falls below the

12   Advisory Guidelines range of 262 to 327 months and is

13   sufficient but not greater than necessary for punishment and

14   deterrence.

15         I'm authorized to find, and do find all of the facts

16   appropriate for a determination of Mr. Shkreli's sentence as

17   follows:  I sentence Mr. Shkreli to a term of 84 months, with

18   credit for time served on each of Counts Three and Six, to run

19   concurrently.  I also sentence him to 60 months with credit

20   for time served on Count Eight to run concurrently with all

21   other counts.

22         Mr. Shkreli has been incarcerated since

23   September 13, 2017.  I sentence Mr. Shkreli to a term of three

24   years supervised release on each count, which will all run

25   concurrently.

Proceedings                                    116

1           I impose the following special conditions:  He must

2    partake in mental health treatment.  He must participate under

3    the supervision of the Probation Department and truthfully

4    disclose his financial conditions so the Probation Department

5    can seek reasonable costs and contributions for his treatment.

6    He must also cooperate with probation in securing any

7    third-party insurance, sources of insurance.  Mr. Shkreli must

8    also comply with the fine and forfeiture orders in this case.

9    He must engage in community service at 20 hours per month

10   under probation's supervision.  Mr. Shkreli shall refrain from

11   engaging in self-employment, which involves access to clients'

12   assets, investments, or money for solicitation of assets,

13   investments, or money; and he is to assist probation in

14   verifying any employment that he secures while under

15   supervision.

16           For the purposes of this order, self-employment

17   includes companies or entities in which Mr. Shkreli is a

18   controlling majority shareholder or an officer or director or

19   otherwise in a position to exercise, control, or direct the

20   operations of the company or entity.  Mr. Shkreli shall

21   provide the Probation Department and the United States

22   Attorney's Office with complete and truthful disclosure of his

23   financial records, including co-mingled income, expenses,

24   assets and liabilities to include yearly income tax returns.

25   With the exception of the financial accounts reported and

1   noted within the presentence report, the defendant is

2   prohibited from maintaining and/or opening any additional

3   individual and/or joint checking, savings or other financial

4   accounts for either personal or business purposes without the

5   knowledge and prior approval of the Probation Department.  The

6   defendant shall cooperate with the probation officer in the

7   investigation of his financial dealings and shall provide

8   truthful monthly statements of his income and expenses.  The

9   defendant shall cooperate in the signing of any necessary

10  authorizations to release information forms permitting the US

11  Probation Department access to his financial information and

12  records.

13          The issue of restitution will be left open pending

14  our submissions regarding the recent submission by the victim.

15          In addition, Mr. Shkreli must pay a fine of $25,000

16  on each of Counts Three, Six, and Eight for a total fine of

17  $75,000.  The fine is due and payable immediately from

18  Mr. Shkreli's assets and income from all sources.  He must

19  also pay a $300 mandatory special assessment with interest to

20  be paid immediately.

21          And I believe Mr. Brafman wanted to make further

22  submissions regarding a recommendation to BOP.

23          MR. BRAFMAN:  Yes, Your Honor.  We could have it by

24  the end of the day Tuesday, if you can keep the judgment of

25  conviction open until then, please.

```
                          Proceedings                      118
```

1          THE COURT:  All right.

2          How much time would the Government need to respond.

3          MS. KASULIS:  Two days, Your Honor.

4          THE COURT:  All right.  So by next Tuesday, the

5     13th, the defense will submit any further submissions

6     regarding restitution or designation.  Why don't we just say

7     Friday, March 16th, the Government will respond.

8          Is there anything else I should address at this

9     time.

10         MS. KASULIS:  No, Your Honor.  Thank you.

11         MR. BRAFMAN:  No, Your Honor.

12         THE COURT:  All right.

13         I do wish you well, Mr. Shkreli.  I do believe that

14    you have the capacity to make a difference in the area of

15    orphan drugs and to help many people in need.  I would

16    encourage you while you are in custody that you seek mental

17    health treatment and that you continue to display your gifts

18    for teaching.  You are obviously a gifted teacher who has

19    assisted many people both within the institution and outside,

20    so I do wish you well, sir.

21         THE DEFENDANT:  Thank you very much, Your Honor.

22         THE COURT:  All right.

23         Is there anything else I should address.

24         MS. KASULIS:  No, Your Honor.

25         MR. BRAFMAN:  No, Your Honor.

1          THE COURT:   Thank you.   We're adjourned.

2          (Matter concluded.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25